[No. S042149. July 20, 1995.]

G. DENNIS ADAMS, a Judge of the Superior Court, Petitioner, v. COMMISSION ON JUDICIAL PERFORMANCE, Respondent.

874

COUNSEL

Lewis, D'Amato, Brisbois & Bisgaard, Douglas R. Reynolds, James E. Friedhofer, Susan E. Leonard, Wingert, Grebing, Anello & Brubaker and Charles R. Grebing for Petitioner.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, James D. Dutton and Laura Whitcomb Halgren, Deputy Attorneys General, for Respondent.

## OPINION

**THE COURT.**—The Commission on Judicial Performance (Commission) has filed in this court its recommendation that G. Dennis Adams, a judge of the Superior Court of San Diego County (petitioner), be removed from office. (See Cal. Rules of Court, rule 919(a).)[1] In support of its recommendation, the Commission submitted findings of fact and conclusions of law determining that petitioner had committed a variety of actions that constituted wilful misconduct in office, conduct prejudicial to the administration of justice that brings the judicial office into disrepute, and improper action. (Cal. Const., art. VI, § 18, former subd. (c).)[2] In response, petitioner filed a petition to modify or reject the recommendation (see rule 919(b)) or, in the alternative, for remand for a new hearing before the Commission, on the ground that petitioner was denied due process of law at his hearing.

We conclude, after independently reviewing the record, that petitioner's due process challenge to the disciplinary proceedings before the Commission has no merit, and that the record supports all of the charges of wilful misconduct and most (but not all) of the charges of prejudicial conduct, and also establishes improper action. With respect to the appropriate discipline, we uphold the recommendation of the Commission that petitioner be removed from office.

I

Petitioner was a judge of the Municipal Court of San Diego County, El Cajon Judicial District, from December 16, 1975, to March 9, 1979, was appointed to the Superior Court of San Diego County in 1979, and was elected and reelected to the superior court for successive terms in 1980, 1986, and 1992.

On December 10, 1992, following an extensive preliminary investigation (rule 904.2), the Commission filed a notice of formal proceedings against petitioner, alleging (in four counts) facts charged as constituting both wilful misconduct and prejudicial conduct. Petitioner filed an answer denying the

---

[1] All further references to rules are to the California Rules of Court.

[2] All further references to article VI are to article VI of the California Constitution. References to wilful misconduct connote wilful misconduct in office; those to prejudicial conduct connote conduct prejudicial to the administration of justice that brings the judicial office into disrepute, and those to improper action connote improper action or a dereliction of duty, all within the meaning of article VI, section 18, former subdivision (c).

charges. Thereafter, the Commission filed a first amended and second amended notice,[3] and petitioner answered, again denying the charges.[4]

In October and November 1993, three special masters[5] appointed by this court held a seventeen-day evidentiary hearing on the issues presented (rules 907-908). The examiners (in this case, deputies of the Office of the Attorney General)[6] prosecuted the charges against petitioner, who was represented by private counsel. Following the conclusion of the hearing, the special masters transmitted to the Commission their proposed report, together with findings of fact and conclusions of law. As to count 1, the masters concluded that the allegations of petitioner's receipt of special benefits had not been established, but that the alleged facts that were found to be true sustained most (but not all) of the charges of separate instances of prejudicial conduct; as to counts 2 and 3, the masters found that certain of the alleged facts had not been established, and the alleged facts that were found to be true did not sustain the charges of either wilful misconduct or prejudicial conduct; and as to count 4, the masters found the alleged facts that were found to be true demonstrated "negligent" prejudicial conduct,[7] but not wilful misconduct. The special masters concluded in their report that petitioner was not guilty of wilful misconduct and that in no instance had he acted in bad faith, but that he was guilty of prejudicial conduct.

---

[3]Third, fourth, and fifth amended notices subsequently were filed.

[4]The Commission concluded that the charges involved moral turpitude, corruption, or dishonesty (within the meaning of former subdivision (f) of article VI, section 18), and that opening the hearing to the public on the charges would serve to maintain public confidence in the judiciary and would further the interests of justice. (Art. VI, § 18, former subd. (f)(3); rule 907.2(c).) On these grounds, the Commission determined to open the hearing to the public, notified the parties of its decision, and scheduled a press release. In response, petitioner filed in this court, in the first instance, a petition for writ of mandate (or other appropriate relief), seeking to stay issuance of the press release and to maintain the confidentiality of the proceedings before the Commission. After we transferred the matter to the Court of Appeal, Fourth Appellate District, the Commission determined to proceed with a closed hearing on the formal charges and otherwise to maintain the confidentiality of the proceedings.

In transferring the matter to the Court of Appeal, we ordered that the Commission maintain the confidentiality of the proceedings and that the record remain sealed during the pendency of the proceedings in that court. The Court of Appeal issued an order to show cause and subsequently filed an opinion granting in part and denying in part the relief sought by petitioner. On petition of both parties, we granted review and ultimately upheld in its entirety the Commission's order authorizing a public hearing. (*Adams* v. *Commission on Judicial Performance* (1994) 8 Cal.4th 630 [34 Cal.Rptr.2d 641, 882 P.2d 358] (*Adams I*).)

[5]The special masters were Patti S. Kitching (associate justice, Court of Appeal), Spurgeon Avakian (superior court judge, retired), and Charles E. Goff (municipal court judge, retired).

[6]The term "examiner" refers to "the counsel designated by the Commission to gather and present evidence before the masters or Commission with respect to the charges against a judge." (Rule 922(f).) Government Code section 68702 directs the Attorney General to act as the Commission's counsel generally, and in investigations or proceedings upon request.

[7]The term "negligent," modifying prejudicial conduct, does not appear in the pertinent constitutional provision.

The examiners filed a lengthy statement of objections to the report of the special masters, disputing in particular the conclusion that certain facts had not been proved and that other facts did not amount to wilful misconduct or prejudicial conduct. The report of the Commission, filed with this court in September 1994, confirmed the special masters' findings with respect to the alleged facts found by the special masters to be true, and found true additional allegations that the masters had concluded had not been proved. The Commission differed significantly from the masters in assessing particular acts as wilful misconduct or prejudicial conduct, concluding that the facts found to be true sustained charges of four separate instances of wilful misconduct and thirteen separate instances of prejudicial conduct, as well as several instances of improper action. By a vote of six to two, the Commission recommended that petitioner be removed from office.

## II

In *Kennick v. Commission on Judicial Performance* (1990) 50 Cal.3d 297 [267 Cal.Rptr. 293, 787 P.2d 591, 87 A.L.R.4th 679], we summarized the applicable standards governing our review of a disciplinary recommendation of the Commission. Under the California Constitution, a judge may be censured publicly or removed from office for action that constitutes "wilful misconduct in office" or "conduct prejudicial to the administration of justice that brings the judicial office into disrepute," and may be admonished privately if found to have engaged "in an improper action or a dereliction of duty . . . ." (Art. VI, § 18, former subd. (c)(2).)[8]

"Wilful misconduct in office" has two elements: the judge's misconduct must be *wilful*, i.e., done with malice or in bad faith, and it must be committed *in office*, i.e., while acting in a judicial capacity. The element of malice or bad faith, in turn, must meet a two-pronged test: the judge must

[8]Former subdivision (c) of article VI, section 18 (the constitutional provision in effect at the time of the instant proceedings), provided in part: "On recommendation of the Commission on Judicial Performance the Supreme Court may . . . (2) censure or remove a judge for action occurring not more than 6 years prior to the commencement of the judge's current term that constitutes wilful misconduct in office, persistent failure or inability to perform the judge's duties, habitual intemperance in the use of intoxicants or drugs, or conduct prejudicial to the administration of justice that brings the judicial office into disrepute. The Commission on Judicial Performance may privately admonish a judge found to have engaged in an improper action or a dereliction of duty, subject to review in the Supreme Court in the manner provided for review of causes decided by a court of appeal."

With the passage of Proposition 190 at the November 8, 1994, election (operative March 4, 1995) section 18 of article VI was amended in several significant respects. Among other amendments to this constitutional provision, former subdivision (c) was amended and redesignated as subdivision (d).

have (1) committed acts he or she knew or should have known to be beyond his or her power, (2) for a purpose other than faithful discharge of judicial duties. (*Kennick* v. *Commission on Judicial Performance, supra,* 50 Cal.3d at pp. 313-314; *Kloepfer* v. *Commission on Judicial Performance* (1989) 49 Cal.3d 826, 832 [264 Cal.Rptr. 100, 782 P.2d 239, 89 A.L.R.4th 235].)

■ Prejudicial conduct, or "conduct prejudicial to the administration of justice that brings the judicial office into disrepute" (art. VI, § 18, former subd. (c)), may be committed by a judge either while acting in a judicial capacity, or in other than a judicial capacity. (*Kennick* v. *Commission on Judicial Performance, supra,* 50 Cal.3d at p. 314.) The provision that the conduct must be that which "brings the judicial office into disrepute" does not require actual notoriety, but only that the conduct, if known to an objective observer, would appear to be prejudicial to public esteem for the judicial office. (*Geiler* v. *Commission on Judicial Qualifications* (1973) 10 Cal.3d 270, 284 [110 Cal.Rptr. 201, 515 P.2d 1].) Unlike wilful misconduct, prejudicial conduct does not require the presence of bad faith, but may occur when a judge, though acting in good faith, engages in conduct that adversely would affect the esteem in which the judiciary is held by members of the public who become aware of the circumstances of the conduct. *(Kloepfer* v. *Commission on Judicial Performance, supra,* 49 Cal.3d 826, 832; *McCullough* v. *Commission on Judicial Performance* (1989) 49 Cal.3d 186, 191 [260 Cal.Rptr. 557, 776 P.2d 259].) The subjective intent or motivation of the judge is not a significant factor in assessing whether prejudicial conduct has occurred under this standard. (*Gonzalez* v. *Commission on Judicial Performance* (1983) 33 Cal.3d 359, 376 [188 Cal.Rptr. 880, 657 P.2d 372].) Although a judge may perform the necessary judicial functions diligently, competently, and impartially, his or her inability to discern (and thus to avoid) extrajudicial activities that reasonably would be perceived as damaging to the judiciary may place that judge's fitness for judicial office in doubt.

■ The canons set forth in the California Code of Judicial Conduct are relevant to the determination whether a judge's actions constitute "conduct prejudicial to the administration of justice that brings the judicial office into disrepute," in that the canons reflect a consensus as to the standards of conduct and appropriate behavior to which judges properly should be held. (*Adams I, supra,* 8 Cal.4th at pp. 661-662.) "The failure of a judge to comply with the canons 'suggests performance below the minimum level necessary to maintain public confidence in the administration of justice.' " (*Id.* at p. 662.)

The acts of misconduct charged in the present proceeding are alleged to have occurred while the 1975 version of the Code of Judicial Conduct was in

effect, prior to adoption of the 1992 version of that code, and thus our assessment of petitioner's conduct is governed by the earlier version of the code. We therefore shall review those pertinent canons as they appeared in the 1975 version. (The pertinent text of the prior version of the canons was adopted in substance in the 1992 version of the code, except where otherwise noted. All references to canons refer to the canons of the Code of Judicial Conduct.)[9]

Former canon 2 provided that a judge should avoid impropriety and the appearance of impropriety in all of the judge's activities and, as a consequence, must accept restrictions on his or her conduct that might be viewed as burdensome by the ordinary citizen. Former canon 2B provided that judges "should not lend the prestige of their office to advance the private interests of others; nor should judges convey or permit others to convey the impression that they are in a special position to influence them." Former canon 5C(1) provided that judges "should refrain from financial and business dealings that tend to reflect adversely on their impartiality, interfere with the proper performance of their judicial duties, exploit their judicial position, or involve them in frequent transactions with lawyers or persons likely to come before the courts on which they serve."

A significant portion of the charges against petitioner involve petitioner's alleged acceptance of gifts, financial benefits, or preferential treatment from attorneys or law firms that appeared before petitioner, and from a litigant in a case over which petitioner presided. The canons, as well as other rules and regulations, pertaining to and governing the propriety of the acceptance of gifts by judges, are therefore particularly apposite to our review of the charges in the present case. ■ Former canon 5C(4) provided that, in general, judges should not accept gifts if the donor is a party or other person whose interests have come or are likely to come before the judge, subject to specified exceptions. Recently, in our decision in *Adams I*, we noted that a judge's acceptance of gifts from those whose interests appear before the court bears an obvious appearance of impropriety, " 'is inherently wrong,' " and " 'has a subtle, corruptive effect, no matter how much a particular judge may feel that he is above improper influence.' " (*Adams I, supra*, 8 Cal.4th at p. 663.)

One of the specified exceptions under former canon 5C(4) to the prohibition against acceptance of gifts from those whose interests have (or are likely

---

[9]In its report containing its findings and conclusions, the Commission referred to the canons as they are designated under the 1992 version of the Code of Judicial Conduct. The differences between the 1975 and 1992 versions of the canons are not substantively significant insofar as the present proceedings are concerned.

to) come before the court, is "ordinary social hospitality." (Former canon 5C(4)(b).) The Judicial Ethics Committee of the California Judges Association has defined ordinary social hospitality as follows: "It is that type of social event or other gift which is so common among people in the judge's community that no reasonable person would believe that (1) the donor was intending to or would obtain any advantage or (2) the donee would believe that the donor intended to obtain any advantage." (Cal. Judges Assn., Jud. Ethics Com., Opn. No. 43 (1994) at p. 4, published in Rothman, Cal. Judicial Conduct Handbook.) Again, in determining the propriety of activity that arguably might qualify as social hospitality, the focus is upon the reasonable perceptions of an objective observer, rather than the motive or intent on the part of the judge.

The California Political Reform Act of 1974 requires that any gift in excess of $50 be reported on a statement requiring disclosure of "[a]ssets and income of public officials which may be materially affected by their official actions . . . ." (Gov. Code, § 81002, subd. (c); see *id.*, §§ 81000, 87207.) As will be shown, petitioner reported on several occasions his receipt of gifts on his yearly financial disclosure statement.

■ In reviewing the report and recommendation by the Commission, this court independently evaluates the evidence taken in the Commission proceedings and must sustain the charges of misconduct if there is clear and convincing evidence sufficient to prove them to a reasonable certainty. (*Kennick* v. *Commission on Judicial Performance, supra,* 50 Cal.3d at p. 314.) In resolving disputed issues of fact, we give special deference to the determinations of the special masters, who were best able to evaluate the credibility of the witnesses appearing before them. (*Id.* at pp. 314-315.) We must then determine whether the conduct found to have occurred is a basis for censure or removal and, if so, the appropriate sanction. In making the latter determinations, we accord great weight to the conclusions of the Commission, recognizing the expertise of the Commission in matters involving judicial conduct. (*Kloepfer* v. *Commission on Judicial Performance, supra,* 49 Cal.3d at p. 832; *McCullough* v. *Commission on Judicial Performance, supra,* 49 Cal.3d at p. 191.)

III

Before turning to the specific evidence against petitioner and the merits of the Commission's findings and conclusions, we shall address petitioner's threshold contention that the disciplinary proceedings before the Commission were tainted by a lack of neutrality and a strong probability of bias

against him on the part of the Commission, resulting in a denial of his right to due process of law.

■ Petitioner contends that the Commission's combined roles as investigator, prosecutor, and adjudicator, as well as litigation adversary, created an unacceptable risk of actual bias on the part of the Commission, thereby denying him his right to due process. He maintains that the administrative procedures governing the proceedings before the Commission, in conjunction with the Commission's efforts (collateral to its determination of the merits of the charges) to validate its order opening the proceedings to the public, resulted in an unconstitutional risk of a biased decisionmaker, because the Commission did not remain a neutral body but assumed an adversarial role during the investigatory and adjudicatory stages.

Petitioner acknowledges that we rejected a somewhat similar argument in *Kloepfer* v. *Commission on Judicial Performance, supra,* 49 Cal.3d at pages 833-835, in which the subject of judicial disciplinary proceedings raised a due process challenge to the Commission's role in the disciplinary proceedings. The judge in *Kloepfer* complained, as does petitioner, that the Commission did not provide a neutral forum, because the accusatory, investigatory, and adjudicatory functions were combined so that the adjudicatory process did not comport with generally accepted standards of due process.

In examining this argument in *Kloepfer*, we turned to the principles articulated by the United States Supreme Court in *Withrow* v. *Larkin* (1975) 421 U.S. 35 [43 L.Ed.2d 712, 95 S.Ct. 1456]. In *Withrow*, the court observed that, in order to prevent unfairness, our legal system refuses to tolerate proceedings in which the risk of actual bias on the part of the decisionmaker is inconsistent with the guarantee of due process. In *Withrow*, itself, however, the court rejected a challenge to the procedures of a medical licensing board that possessed both investigatory and adjudicatory functions, concluding that, in general, it is appropriate to presume the integrity of those serving as adjudicators in an administrative proceeding, and, accordingly, that a challenge on such a ground carries a very high burden of persuasion. (421 U.S. at pp. 47 [43 L.Ed.2d at pp. 723-724].)

We concluded in *Kloepfer* that the challenged procedures of the Commission involved even less potential for biased decisionmaking than those upheld by the high court in *Withrow*. We noted that the prosecutorial function rested largely with examiners from the Attorney General's office, that the Commission independently reviews the evidence and makes its own findings and conclusions, and that this court is the final decisionmaker and

must review the evidence and independently assess its weight and significance. (49 Cal.3d at p. 835.) We therefore concluded that the procedures to which the judge objected did not create an unacceptable risk of bias either on the part of the Commission or on the part of the court as the ultimate decisionmaker.

Petitioner contends that the circumstances in the present case, in which petitioner challenged the Commission's open-hearing order in a collateral writ proceeding (see *Adams I, supra,* 8 Cal.4th 630), created a significantly greater risk of bias against him than the risk of bias present in *Kloepfer*. He argues that the Commission's role as his opponent in that collateral proceeding, in seeking to validate the open-hearing order, converted the Commission from a neutral forum to an adversarial party. He argues that the Commission's vigorous opposition to his attempt to vacate the open-hearing order, using as legal counsel the same attorneys who were prosecuting the charges, inevitably prejudiced the Commission against him with respect to the merits of the charges, creating a strong probability of bias against him.

The Commission ordered open the hearing for the purpose, and in the interest, of maintaining public confidence in the judiciary and its disciplinary procedures, pursuant to the provisions of article VI, section 18, former subdivision (f). Having determined that the charges against petitioner involved moral turpitude, dishonesty, or corruption, and that an open hearing would best serve public confidence and the interests of justice, the Commission was bound to seek implementation of the open-hearing procedures, as one of the duties required of it under the foregoing former provision of the California Constitution predating Proposition 190. The Commission's use of the Attorney General as legal counsel for this purpose was appropriate under Government Code section 68702, and did not create any risk of bias on the part of the Commission greater than if different counsel had been employed—any counsel retained by the Commission for this purpose would have assumed the role of advocate in representing the Commission.

Not surprisingly, petitioner cites no authority in support of his contention that the Commission's defense of its open-hearing order rendered the Commission a biased tribunal. Petitioner's premise would lead to the absurd consequence that an administrative agency charged with adjudication of a claim in an administrative proceeding would be disqualified from performing its function whenever it was required to assert or defend its position against the claimant in a matter preliminary to a final determination of the merits of the claim. Such a result would be inconsistent with a large body of decisional law relating to administrative proceedings (see, e.g., *Summers* v.

*City of Cathedral City* (1990) 225 Cal.App.3d 1047 [275 Cal.Rptr. 594]; *Park Motors, Inc.* v. *Cozens* (1975) 49 Cal.App.3d 12 [122 Cal.Rptr. 337]) and essentially would emasculate the ability of an agency to serve many of the functions for which it is responsible. As the high court explained in *Withrow,* in all adjudicatory proceedings the judge or other decisionmaker frequently renders preliminary or interlocutory orders (e.g., issuing arrest warrants based upon a finding of probable cause, or a preliminary injunction) that, except in unusual circumstances, do not give rise to a presumption of bias precluding that decisionmaker from making a finding of guilt or innocence in a criminal proceeding or a final adjudication of the merits of a dispute in a civil proceeding. (421 U.S. at p. 56 [43 L.Ed.2d at pp. 728-729].)

In a related argument, relying upon remarks made by a number of Commission members during oral argument before the Commission, petitioner appears to contend that the record establishes actual bias or prejudice on the part of particular Commission members.

During the course of his argument before the Commission, petitioner's counsel noted that the disciplinary proceeding raised questions regarding public perception of the judiciary and suggested that public confidence in the proceedings would best be served if the Commission accorded serious weight to the findings and conclusions of the special masters, who diligently had heard all the evidence.

Commissioner Andy Guy questioned petitioner's counsel regarding that suggestion, asking: "If you were so interested in the public, the public outrage, why did you try to keep this thing secret from the public all the way through? No open hearing?" Commissioner Essegian noted shortly thereafter, with regard to Commissioner Guy's comments, that "there has been a real effort here to keep everything confidential." In closing argument, the examiner suggested that the reason petitioner had not sought to open the proceedings to the public was that he knew the public would be outraged by the truth.

Petitioner contends the foregoing comments of the Commission members, considered in conjunction with the examiner's argument, reflect the Commission's improper consideration of the earlier writ proceeding in formulating its disciplinary recommendation. He argues that the Commission's consideration of this collateral matter constituted an abuse of the Commission's discretion and "tainted" the proceedings.

The record fails to establish that the determination by the Commission of the appropriate disciplinary recommendation was based upon a desire improperly to penalize petitioner for having challenged the open-hearing order.

The issue whether the Commission properly issued its open-hearing order was resolved in the collateral writ proceeding that remained separate in all respects from the hearing and determination of the charges on the merits. The Commission's findings and conclusions that led to its disciplinary recommendation are based upon the evidence adduced at the hearing on the merits of the charges. The exchange between petitioner's counsel and the commissioners at oral argument simply reflects the commissioners' unwillingness to let counsel's argument pass (as to how the public confidence best would be served) without testing the basis for that argument and assessing whether petitioner's actions were truly consistent with his counsel's position. The colloquy demonstrates a normal function of oral argument and provides no basis for the conclusion that the Commission penalized petitioner for challenging the open-hearing order.

For these reasons, we conclude the record fails to support petitioner's claim that the Commission proceedings were tainted by actual bias or prejudice against him (or by an unacceptable risk thereof), in violation of due process requirements.

IV

Turning to the charges against petitioner and the merits of the Commission's findings and conclusions, we first set forth the uncontroverted factual scenario underlying a substantial portion of the allegations of misconduct.

From August through October of 1985, petitioner presided over the trial in a complex civil case, Security Pacific National Bank v. Williams (Super. Ct. San Diego County, 1985, Nos. 457727 and 457728), between the named bank and James Williams, an automobile dealer. The litigation involved an action by the bank against Williams to enforce personal guaranties for indebtedness that had been executed by Williams, and a related cross-action by Williams against the bank, seeking tort damages for alleged fraud and other misconduct in the course of his transactions with the bank. Williams was represented in the litigation by Attorney Patrick Frega.

The trial commenced as a jury trial but concluded as a court trial. Following the presentation of evidence, petitioner devoted approximately 100 hours to drafting his written decision. In early 1986, petitioner rendered the decision, awarding judgment in favor of Williams in the amount of approximately $5 million, expressly reserving jurisdiction to determine attorney fees and costs on appeal. Security Pacific appealed from the judgment.

The matter was pending on appeal from mid-1986 to August 31, 1989, when the judgment was affirmed by the Court of Appeal in an unpublished

opinion. (*Security Pacific National Bank* v. *Williams* (Aug. 31, 1989) D004365).) On January 9, 1990, the appellate court issued its remittitur. On January 22, 1990, Patrick Frega filed in the trial court a motion for attorney fees and costs on appeal. The motion was scheduled to be heard on February 27, 1990, in petitioner's courtroom. In late January 1990, Security Pacific paid the judgment in full, including interest, in a total amount exceeding $7 million. On January 29, 1990, Frega signed an acknowledgment of satisfaction of judgment in full, as well as a waiver of attorney fees, and caused to be removed from the trial calendar the motion for fees and costs. ·

From 1989 through 1991, petitioner engaged in five business transactions with Williams and his dealership, involving the purchase and repair of automobiles. Four of these five transactions also involved Attorney Frega.

We shall consider the charges that were upheld by the Commission as framed in the four counts set forth in the notice of formal proceedings,[10] first reciting the specific allegations and then reviewing the evidence presented before the special masters, the findings and conclusions of the special masters, and the findings and conclusions of the Commission.

*Count 1*: Count 1 alleges that petitioner and members of his family received gifts and financial benefits from Williams, including discounts and favorable prices for the purchase of automobiles and for repairs. Count 1 sets forth seven separate incidents, including five automobile-related transactions, a celebration dinner, and the gift of a sweater.

(A) *The purchase of the 1986 Mercedes.*

Subcount (a) alleges that in early 1989, while the Security Pacific case remained pending on appeal, petitioner personally contacted Williams, requesting that the car dealer search for a used Mercedes automobile for petitioner's wife. Williams sold a 1986 Mercedes 300E to petitioner in March 1989, personally setting the sales price at $20,537, an amount that allegedly appeared to be favorable to petitioner.

The record reflects that in 1989, approximately three years following entry of judgment in the Security Pacific case, but while the case remained pending on appeal, petitioner contacted Williams, indicating that he was looking for a used automobile for his wife. At the time, petitioner had no

---

[10]We do not review the subcounts of charges that were dismissed by the Commission. (*Kennick* v. *Commission on Judicial Performance, supra,* 50 Cal.3d at p. 332; *Spruance* v. *Commission on Judicial Qualifications* (1975) 13 Cal.3d 778, 785, fn. 5 [119 Cal.Rptr. 841, 532 P.2d 1209].)

personal or other relationship with the car dealer, other than having seen him on occasion at social events. In his answer to the formal notice, petitioner explained his motive in contacting this particular car dealer: "I contacted Mr. Williams because I did not want to deal with used car salesmen who would try to hassle or negotiate a price. I simply indicated to Mr. Williams . . . that I expected to pay fair value for it." Williams testified that petitioner told him that he did not want any "special deal" and that Williams should "make money" on the transaction. Williams thereafter delivered to petitioner a used Mercedes 300 E, bearing approximately 57,000 miles, that had been traded in to the dealership. At the time, petitioner did not inquire regarding the purchase price. Petitioner later telephoned Williams to inform him that his wife was pleased with the Mercedes and asked Williams to inform him as to the amount that he owed. Williams personally set the base sales price at $20,537. Petitioner paid the total purchase price of $22,532.15, without further inquiry or negotiation, and without investigating the prices of comparable vehicles or otherwise attempting to determine the fair market value of the Mercedes. He indicated to Williams that he would rely upon the auto dealer's professional judgment "if you think it's a good car and a good deal."

Expert testimony was presented regarding the fair market value of the Mercedes, establishing that used automobile prices are determined by a number of factors, including the "Kelly Bluebook" value, the type of dealership, the mileage and condition of the vehicle, and the profit margin for the dealership. The examiners presented evidence that the sales price of $20,537 was approximately $5,000 below market value. The testimony of the former Mercedes owner, however, among other evidence, indicated that as a result of the terms of the sale of a new vehicle to the former Mercedes owner, the actual cost of the Mercedes to Williams was $18,000. At this cost, after servicing the vehicle prior to sale, the dealership realized a total profit in the range of $2,000, an amount in excess of the average profit realized on a retail used-automobile sale for the dealership.

The special masters found that Williams did not confer any special benefit upon petitioner with respect to the purchase price charged for the Mercedes. In this regard, the special masters found that the amount of profit realized by Williams on the transaction was critical to the determination of whether he gave petitioner a "good deal," and that even the examiners acknowledged that a profit in excess of $2,000 would be commercially reasonable. For these reasons, the masters concluded that the price set by Williams was not unduly favorable. The masters nevertheless concluded that petitioner's actions in engaging in a business relationship with Williams—after rendering an enormous judgment in favor of this litigant—undermined public confidence in the judiciary, because a person aware of the circumstances of the

transaction reasonably might entertain a doubt as to whether it was "tilted in [petitioner's] favor by reason of the decision he had made."

The Commission found that petitioner initiated the Mercedes transaction with Williams with the expectation of receiving favorable treatment, and that petitioner purchased the Mercedes on terms more favorable than those normally made available to members of the general public. In this regard, the Commission found, contrary to the finding of the special masters, that the amount of profit realized by Williams on the transaction was not determinative of whether petitioner was charged a favorable price by the automobile dealer.

The Commission concluded it was improper for petitioner to engage in a business transaction with Williams after awarding him a multimillion dollar judgment in a court trial, and while the case remained pending on appeal with jurisdiction reserved by petitioner for the determination of attorney fees and costs on appeal. The Commission concluded petitioner's actions were contrary to canons 2A and 4D(5) of the Code of Judicial Conduct and characterized this misconduct as an abhorrent disregard for the integrity of the judicial office that was harmful to public confidence in the judiciary. The Commission unanimously concluded petitioner's actions constituted prejudicial conduct.

We conclude the record does not contain clear and convincing evidence that petitioner initiated the transaction with the expectation of receiving a financial favor. Petitioner's explanation for contacting Williams rather than some other used automobile dealer (he did not wish "to deal with used car salesmen who would try to hassle or negotiate a price") is plausible and supported by the testimony of Williams that petitioner affirmatively stated he did not seek any "special deal."

We also agree with the finding of the special masters that the record fails to provide clear and convincing evidence that petitioner paid a price for the purchase of the Mercedes that was unduly favorable to him and that would not have been offered to members of the public. The Commission's expert testimony that the purchase price was approximately $5,000 below market value was controverted in part by expert testimony presented by petitioner, establishing that when a used Mercedes is traded to a non-Mercedes dealership, the dealership generally will seek to wholesale the vehicle as quickly as possible, rather than sell it to the general public, in order to recover immediately the dealer's cash investment.

Regardless whether petitioner received a discount or other financial benefit, however, the foregoing circumstances establish that petitioner initiated a business transaction with, and actively solicited the assistance of,

Williams, a litigant in favor of whom petitioner had rendered an exceedingly large monetary judgment and, even more significantly, whose interests remained before petitioner while the case was pending on appeal. The nature of the transaction also is significant—the sale by an automobile dealership of a used vehicle, generally providing leeway for bargaining and flexibility in setting the purchase price. In so acting, petitioner violated the general proscription against conduct giving rise to the appearance of impropriety (former canon 2), including extrajudicial activities that may cast reasonable doubt upon the individual's capacity to act impartially as a judge, and business dealings that reasonably may be perceived as exploiting the judge's position (see former canon 5(C)). To an objective observer of the transaction, petitioner would appear to have been seeking to use his office to collect for past deeds, and to procure a benefit for himself. Both the size of the purchase, and the flexibility of the pricing in particular, likely would render the transaction questionable from the perspective of an objective observer. Petitioner's actions would have placed in doubt his ability to act with integrity, independence, and impartiality. We therefore uphold the charge of prejudicial conduct set forth in subcount (a).

(B) *The celebration dinner and purchase of the Jeep.*

Subcount (b) alleges that in approximately February 1990, petitioner attended a dinner hosted by Frega in celebration of the satisfaction (in January 1990) of the judgment in the Security Pacific litigation (a judgment totaling, with accrued interest, in excess of $7 million). The dinner was attended by approximately 25 guests, including Williams, Frega, and members of Frega's law firm. Frega paid for the dinner at a cost of approximately $1,500.

The evidence established that Frega hosted the celebratory dinner at a restaurant. Petitioner and his wife arrived late, stayed approximately 45 minutes, and then departed. While there, they each consumed some food but no alcoholic beverages.

Subcount (b) further alleges that, approximately two months after satisfaction of the judgment, and following his attendance at the celebratory dinner, petitioner contacted Williams, asking the automobile dealer to locate a used vehicle for his daughter. On or about March 22, 1990, Williams delivered a 1988 Jeep Cherokee to petitioner, setting the sales price at $13,500, totalling $14,796.74 with tax and license—an amount that allegedly appeared to be unduly favorable to petitioner. At that time, the sole consideration tendered by petitioner for the Jeep was the trade-in of a 1983

Oldsmobile, reflected on the sales invoice as having a value of $800. On April 16, 1990, petitioner paid an additional $5,000 for the Jeep. On or about June 4, 1990, "Patrick Frega, counselor at law, a professional corporation," issued a check to Williams for $9,796.74, a sum equal to the total sales price of $14,796.74, less the $5,000 paid on April 16. A notation on the check indicated that the payment related to "Williams v. Security Pacific National Bank." By check dated June 7, 1990, petitioner wrote a check to Frega personally in the amount of $5,672.40. The check indicated that it was a "payoff" on the Jeep.

The record reflects that at the time he contacted Williams regarding the Jeep, petitioner told the dealer he could afford to pay approximately $5,000 to $5,500 plus the trade-in value of the 1983 Oldsmobile. Williams testified petitioner emphasized that he did not want "any favors" and that the dealer should "make money" on the transaction. Williams was aware, however, that petitioner was experiencing financial difficulties as a result of the dissolution of his marriage. Approximately two weeks later, Williams delivered a 1988 Jeep Cherokee to petitioner. At the time, petitioner was aware that the value of the vehicle likely exceeded the amount he had indicated to Williams he could afford. He did not raise this issue with Williams or otherwise inquire regarding the purchase price. A few days later, petitioner telephoned Williams to confirm that he would purchase the vehicle.

An invoice for the transaction dated March 22, 1990, was prepared by the dealership, listing the base price of the Jeep at $13,500, with a total sales price of $14,796.74. The invoice reflected a credit in the amount of $800 for the Oldsmobile. On May 7, 1990, the dealership sold the Oldsmobile for $800.

At the time he confirmed he would purchase the Jeep, petitioner was neither presented with a sales invoice nor asked to sign any contract; no arrangements were made with Williams for payment or for financing the purchase, and petitioner was not sent a bill. Apart from the trade-in of the Oldsmobile, petitioner made no payment on the purchase price until April 16, 1990, when he paid the dealership $5,000 that he had borrowed from his father. At that time, petitioner inquired of Williams regarding the balance owed on the purchase price. Williams insisted (incorrectly) that the balance had been satisfied by the trade-in of the Oldsmobile. Petitioner testified that he simply "could not get a number out of [Williams]" but was aware that additional sums were owed.

In late May, petitioner requested that Frega ascertain the balance due on the purchase of the Jeep. A few days later, when Frega reported back that

petitioner owed $5,672.40, petitioner wrote a check to Frega personally for that amount. Frega testified he did not inform petitioner of the true balance owed, because Frega was aware of petitioner's financial difficulties as a result of the pending dissolution of petitioner's marriage. Frega therefore made a unilateral decision to "loan" petitioner the approximate $4,000 additional amount owed, with the intention of recovering the loan at a later date, and wrote a check to the dealership in the amount of $9,796.74.

Williams testified that prior to the Jeep purchase transaction he had had a long-standing, ongoing "understanding" with Frega that, with respect to any customer referred by Frega to Williams, if Williams felt that "I [Williams] didn't make enough money or if I was going to get stuck on the hook or if it was maybe the difference between wholesale and retail, that he [Frega] would take care of the difference." At the time of the Jeep transaction, Williams considered petitioner to be a customer referred by Frega and thus covered by this understanding.

The special masters found that in purchasing the Jeep from Williams, petitioner had not been seeking any financial advantage from the dealer, and concluded that petitioner had been unaware of the gift conferred upon him by Frega until after the commencement of the Commission investigation. The special masters concluded, however, that under the circumstances petitioner should have been alerted to the risk that his conduct might have endangered the public esteem in which the judiciary was held, and that his actions therefore amounted to prejudicial conduct.

The Commission found that the total amount paid by petitioner (the $800 value of the Oldsmobile trade-in plus the cash payments of $5,000 and $5,672.40) was below the fair market value of the Jeep. The Commission concluded that it was misconduct for petitioner to engage in the Jeep transaction with Williams in light of the circumstances that petitioner had entered a multimillion dollar judgment in favor of Williams that recently had been paid in full and recently had attended a celebration dinner occasioned by satisfaction of the judgment. Contrary to the finding of the special masters that petitioner had not been seeking any financial advantage, the Commission found that petitioner had initiated this transaction with Williams in the expectation of receiving favorable treatment, and that in fact he received benefits that a member of the general public would not have received, both in the manner in which the transaction was conducted and the price that was charged.

The Commission unanimously concluded that petitioner's actions both with regard to his purchase of the Jeep and his attendance at the celebratory

dinner were contrary to current canons 2A and 4D(5) and constituted prejudicial conduct.

■ Clear and convincing evidence supports the charges of misconduct alleged in subcount (b) of count 1, and we adopt the conclusion of the Commission that petitioner engaged in prejudicial conduct. As with the transaction involving the purchase of the 1986 Mercedes, petitioner's conduct in initiating a transaction with the automobile dealer, in this instance shortly following the payment in full of the substantial judgment in the Security Pacific litigation, violated the proscription of former canons 2 and 5 against conduct giving rise to the appearance of impropriety. Petitioner's testimony that he thought he would be getting a "fair deal" from the dealer (rather than a "special deal") is not inherently incredible, and we defer to the findings of the special masters that petitioner did not initiate the transaction with the expectation of receiving favorable treatment. To a member of the public, however, petitioner's actions, shortly following the euphoria surrounding satisfaction of a multimillion dollar monetary judgment rendered by petitioner in a court trial, readily could be construed as an attempt by petitioner to exploit his judicial office for personal advantage. Although petitioner insisted that he wished to pay fair market value for the Jeep, his insistence could well be viewed as disingenuous under the circumstances, particularly where Williams had delivered the vehicle to him without presenting a sales contract or otherwise setting the purchase price, and did not require immediate payment. Furthermore, the record provides clear and convincing evidence that petitioner received favorable terms in the manner in which the transaction was handled—terms that would not have been afforded to members of the public. He was not required to sign a sales contract, and he made payment on the purchase price on a schedule of his own choice rather than in accordance with the method of payment generally required by the dealership for similar purchase transactions.

Regardless whether petitioner had actual knowledge that he had not paid fair market value for the Jeep, or that Frega had paid the balance owed on the purchase price, petitioner's reliance upon Frega to finalize the transaction strongly suggested impropriety. Frega represented Williams, the litigant in favor of whom petitioner had awarded the multimillion dollar judgment following a court trial, and, pursuant to a contingency fee arrangement, Frega had a 40 percent interest in the amount of the final judgment following affirmance on appeal. Additionally, matters involving the Frega firm frequently came before petitioner. The record establishes that, in placing himself in Frega's hands, petitioner deliberately ignored the strong possibility that Frega ultimately would arrange for petitioner to pay less than fair

market value for the Jeep, a favor that Williams already had attempted to confer upon him. Thus petitioner's conduct readily could be construed as an attempt to collect for judicial services rendered in the Security Pacific litigation, and otherwise to use his judicial office to advance his personal interests. To an objective observer, petitioner's integrity and impartiality would appear to have been placed in doubt.

█ We also adopt the conclusion of the Commission that petitioner's attendance at the dinner given in celebration of the satisfaction of the judgment in the Security Pacific litigation constituted prejudicial conduct. Again, regardless of petitioner's motives, or of whether he was biased or impartial in the judicial proceedings involving the Security Pacific litigation, his attendance at the dinner indisputably gave rise to the appearance of partiality in favor of a litigant and his attorney whose very substantial interests had come before him. Under these circumstances, the dinner could not be characterized as ordinary social hospitality within the meaning of former canon 5C(4)(b).

(C) *The Jeep repair.*

Subcount (c) alleges that in or about November and December 1991, Williams's dealership performed repairs on petitioner's daughter's Jeep. The dealership discounted by 10 percent the cost of parts and labor, resulting in a balance due of $8,500. On December 9, 1991, petitioner paid Williams $7,000. On that same day, "Patrick Frega, counselor at law, a professional corporation," issued a check to Williams's dealership in the amount of $1,500 toward payment of the bill.

The evidence established that the Jeep had been severely damaged in an accident. Petitioner contacted Williams regarding the cost to repair the vehicle and was informed it would range from $8,000 to $8,500. Petitioner expressed his displeasure with the estimate, indicating it would make more sense economically to scrap the vehicle for salvage value. Williams replied he would investigate the availability of used parts, which would lower the cost of repairs. Williams ultimately directed the preparation of a repair order estimate that would not exceed $8,500.

Frega subsequently informed petitioner that Williams had advised him the repairs could be performed at a cost of $7,000. Because of his earlier conversation with Williams, petitioner assumed Williams had found used

parts for the repairs. He telephoned Williams and authorized him to proceed.[11] Williams's dealership sent a bill in the amount of $8,500 to petitioner's former residence, where his ex-wife continued to reside with their children. In December 1991, three weeks after the Jeep was delivered to petitioner's daughter, petitioner paid Williams $7,000. Without petitioner's knowledge, Frega wrote a check to the dealership in the amount of $1,500 for the balance owing.

The special masters found that Williams had billed the cost of repairs at $8,500 but had not sent the bill to petitioner, and that petitioner reasonably believed the cost of repairs was $7,000. The masters further found that the $8,500 bill resulted in a substantial gross profit for Williams, and that even at a charge of $7,000, Williams still would have realized a gross profit of more than $1,700, so that Williams had not conferred any special benefit upon petitioner. The masters further found that prior to the investigation petitioner had not had any knowledge of the $1,500 payment made by Frega. The masters finally concluded, however, that petitioner's actions constituted prejudicial conduct because of the risk of the appearance of impropriety.

The Commission concluded that the Jeep repair transaction was "not handled in the manner that repair transactions involving members of the general public were handled," noting the circumstances that petitioner had not been required to make payment immediately upon delivery of the vehicle, and that Frega had been involved in the transaction. The Commission found that petitioner initiated this transaction with the expectation of receiving favorable treatment, and concluded that it was improper for petitioner to engage in a business transaction with Williams, particularly in view of the circumstance that petitioner was aware that Williams previously had attempted to confer a special favor upon him in connection with the purchase of the Jeep.

The Commission concluded that petitioner's actions with regard to the Jeep repair were contrary to canons 2A and 4D(5), demonstrated a lack of integrity, and constituted prejudicial conduct.

We conclude the record fails to provide clear and convincing evidence that petitioner initiated this transaction with Williams with the expectation of

---

[11] In his declaration set forth in his answer to the formal notice, petitioner explained that, when advised the cost of repairs likely would exceed $8,000, he "decided to dispose of the Jeep for salvage at this point, in essence, junking it, and told Mr. Williams this fact. Mr. Williams stated that he would check into getting used parts from an autodismantler to see if the Jeep could be repaired for less. Several weeks later, I was informed that the repair of the Jeep could be accomplished for $7,000."

receiving favorable treatment. Petitioner's choice of Williams to perform the repairs was logical in light of the circumstance that Williams's dealership had sold him the Jeep and the urgency of the situation (the Jeep had to be towed from the scene of the accident to a body shop). The record also supports the finding of the special masters that petitioner reasonably believed that the cost of the repairs was $7,000, in light of his previous conversations with Williams.

We also defer to the finding of the special masters that the $7,000 price paid by petitioner was commercially reasonable, in light of the evidence indicating that it resulted in a substantial markup for Williams above cost. A colloquy between petitioner's counsel and Williams at the hearing before the masters is illuminating in this regard: "[Counsel]: How far would you go down on a deal in an ordinary business setting, you know, somebody you didn't know that brings a car in for repair that they've purchased from you, what percentage of mark-up over your cost would you go down to before you'd let them take the deal—the repair somewhere else? [¶] [Williams]: *If I got involved, I would let them come down to somewhere in the neighborhood of around 40 percent.* [Counsel]: *Okay, so you could make 15, $1,800 on a repair like this, rather than lose the deal, you'd take that?* [Williams]: *Sure.*" (Italics added.) We also defer to the finding of the special masters that petitioner was truthful in his testimony that he was unaware of Frega's $1,500 contribution toward the repair bill.

 As with the Jeep purchase transaction, however, petitioner's reliance upon Frega for the financial arrangements, in view of his relationship with this attorney and the frequency with which Frega's interests came before petitioner, clearly was improper. Regardless whether petitioner had knowledge of Frega's payment, his failure to obtain a bill for the repairs directly from Williams, and his reliance upon Frega to verify the cost, reflect that petitioner turned a blind eye toward the possibility of receiving special treatment, whether from Williams or Frega, or from both men. To an objective observer, petitioner would appear to have been seeking to use his judicial office to advance his personal interests, placing in doubt both his independence and his integrity. We therefore conclude the record supports the charge of prejudicial conduct with regard to this incident.

(D) *Rental car.*

Subcount (d) alleges that in 1991, Williams's dealership and Frega arranged for a rental car for petitioner's daughter while her Jeep Cherokee was being repaired. In January 1992, Frega paid the $1,063.53 bill for the car rental.

The evidence established that, after petitioner's daughter visited Williams's dealership to discuss the repair of the Jeep, she was transported in a shuttle bus from the dealership to a rental car agency. After the agency informed her that because she "wasn't old enough, that there might be problems" in obtaining a rental car, she returned home (where she resided with her mother, petitioner's ex-wife). She later telephoned petitioner at the courthouse to inform him that she had been unsuccessful in obtaining a vehicle for her use while the Jeep was being repaired. Petitioner telephoned Frega, inquiring whether Williams's dealership had "loaner cars," and Frega responded that they did, advising that he would look into the matter. Frega subsequently arranged for a rental in his name, authorizing use of his American Express card as security for the bill. Petitioner was aware his daughter had been provided with a vehicle for use during the course of the repairs but testified that prior to the investigation he had been unaware of the financial arrangements.

The special masters concluded that petitioner's conduct relating to the automobile rental constituted prejudicial conduct.

The Commission found that petitioner had engaged in misconduct in contacting Frega regarding the rental, and specifically in asking the attorney to intervene under circumstances where a "loaner" previously had been refused to petitioner's daughter. The Commission further found that petitioner had received a special benefit in the manner in which the rental transaction was handled. The Commission concluded that petitioner's actions with regard to the automobile rental were contrary to canons 2A and 4D(5), demonstrated a lack of integrity, and constituted prejudicial conduct.

Clear and convincing evidence supports the Commission's findings, which in turn support the conclusion that petitioner engaged in prejudicial conduct. Regardless whether petitioner had knowledge of the financial arrangements involved in the automobile rental, including Frega's payment of the bill, petitioner's actions in contacting Frega and permitting him to intervene in a transaction involving Williams strongly suggest that petitioner was seeking to use his judicial office to advance his personal interests and those of a family member. Petitioner's conduct also permitted the inference that Frega was in a special position to influence petitioner, another violation of the Canons of Judicial Ethics.

(E) *The detailing and rims for the 1981 Mercedes.*

Subcount (e) alleges that in 1991, Williams gave petitioner "a set of wheels" for petitioner's 1981 Mercedes. In May 1991, when Williams's

dealership had detail, refinish, and polish work performed on the Mercedes at a cost of $511.82, Frega paid the bill.

The evidence established that in May 1991, shortly before petitioner and his wife left for a one-month vacation abroad, petitioner arranged to leave the 1981 Mercedes at Williams's dealership to have detailing work performed in his absence. He arranged for Frega to meet him at the dealership so that Frega could drive him home. When petitioner and Frega met with the "fleet manager," petitioner advised the manager to contact Frega if any questions arose in his absence regarding the work to be performed. The job was completed at a cost of $511. Without authorization, Williams also had an old set of Mercedes rims placed on the vehicle. The fleet manager instructed the body work department to bill Frega, and a bill for $511 for buffing and polishing was sent to him. Frega paid the bill in July 1991. After the vehicle was delivered to petitioner's residence, petitioner upon his return from vacation noticed the replacement rims. He then telephoned Williams, told him the work was acceptable, and asked him to send a bill. Petitioner, however, never was billed and never paid for any of this work.

The special masters concluded that petitioner's conduct amounted to prejudicial conduct. As with the prior transactions with Williams, the Commission also determined that petitioner had engaged in misconduct, particularly in making no effort to ensure that he received a bill or paid for this work. The Commission concluded that petitioner's actions with regard to this transaction were contrary to canons 2A and 4D(5), demonstrated a lack of integrity, and constituted prejudicial conduct. Clear and convincing evidence, set forth above, supports the findings and conclusions of the Commission, which we adopt as our own.

(F) *The gift of a sweater from Williams.*

Subcount (f) alleges that in December of 1990 (the year Williams received satisfaction of his multimillion dollar judgment), Williams gave petitioner a gift of a sweater, which petitioner accepted. Petitioner reported the gift of the sweater, valuing it at $150, on his financial disclosure statement.

The special masters concluded that the incident was of de minimis importance and that petitioner's mere failure to return the gift did not amount to prejudicial conduct.

The Commission reached a different conclusion, observing that because the gift was from a litigant in favor of whom petitioner had awarded a

multimillion dollar judgment, and was given the same year the judgment was paid (shortly after petitioner attended a dinner in celebration of that payment), petitioner's acceptance of the gift constituted prejudicial conduct.

We agree with the conclusion of the Commission. Although petitioner did not solicit the gift, under the circumstances it was incumbent upon him to return it to Williams in order to avoid any doubt regarding the judge's independence or any appearance of impropriety.

In conclusion, we find that clear and convincing evidence supports the numerous charges of prejudicial conduct set forth in count 1 that were sustained by the Commission.

*Count 2*: Count 2 alleges that petitioner received gifts from attorneys, including Frega, whose interests had or were likely to come before the judge. In proceedings (including settlement conferences) involving these attorneys, petitioner failed to disqualify himself or make full disclosure on the record of his relationship with these attorneys or their firms, or to obtain a written waiver of disqualification. In particular in cases where petitioner's sole involvement was to preside over settlement conferences, he failed to make adequate disclosure of his relationship with these attorneys or the gifts he had received from them.

We shall address each of the instances of charged misconduct that were sustained by the Commission.

(A) *Gifts and favors from Frega.*

In 1987, Frega was honored by the San Diego Trial Lawyers Association as "trial lawyer of the year," as a result of his success in the Security Pacific litigation. Frega asked petitioner to present the award to him at an awards dinner. Petitioner was unable to attend the dinner but agreed to take a "rain check." Frega and his wife took petitioner and his wife to the "rain check" dinner (the term alleged in count 2) on July 2, 1987. On his financial statement filed for that year, petitioner reported the value of the dinner at $100.

Count 2 further alleges that petitioner reported accepting a loan of Frega's computer from December 1, 1987, to June 30, 1988, and from November 1, 1989, to December 31, 1990, valuing the loans at $1,300.

Count 2 additionally alleges the monetary gifts and payments made by Frega in connection with the automobile-related transactions that comprise the charges set forth in count 1.

The record reflects that at the "rain check" dinner, petitioner discussed with Frega a novel that petitioner was writing, and the two men agreed informally to collaborate on the novel. At the time of this dinner, the Security Pacific case was pending on appeal, with petitioner having reserved jurisdiction to determine attorney fees and costs on appeal. Additionally, petitioner was acting as the settlement judge in a case involving the Frega firm, and was assigned as judge for all purposes in another case in which Frega's firm represented several of the plaintiffs. Previously, in 1986 and 1987, petitioner had been the settlement judge in a case involving the Frega law firm, in which Frega's clients received in excess of $500,000 in settlement proceeds.

To facilitate the writing of the book, petitioner accepted the loan of Frega's laptop computer, reporting the value of the loan in the financial disclosure statements filed by petitioner for consecutive years.

During the period of the loan of the computer to petitioner, a personal friendship developed between the two men, and six cases in which one or more of the parties were represented by Frega's law firm were pending before petitioner. All six of these actions were settled on terms under which the parties represented by Frega's law firm received substantial, and in some cases multimillion dollar, sums in settlement proceeds.

In 1988, after their personal friendship had developed, petitioner informed Frega that he no longer would preside over any matter in which Frega appeared. Frega paraphrased petitioner as informing him that " 'I've gotten to the point where I don't believe I can hear your cases. So what I'll do is since I've got settlement conferences or cases for your partner, Tiffany, I will hear cases until there's a contested motion or ruling I have to make as to questions of fact, and I will recuse myself.' "

The special masters found that the "rain check" dinner was part of an exchange of social amenities among personal friends and did not amount to misconduct. They found the computer loan amounted to at most "improper action."

■■■ The Commission concluded that petitioner's acceptance of the "rain check" dinner, after awarding Frega's client a multimillion dollar judgment that was pending on appeal following a court trial, and while cases handled by Frega's law firm either had come or were likely to come before petitioner, amounted to prejudicial conduct.

The Commission concluded that the computer loan could not properly be characterized as an exchange of social amenities, and that in light of the

circumstance that the loan was made while Frega's law firm was handling cases that were pending before petitioner, petitioner's acceptance of the loan constituted prejudicial conduct.

We conclude that petitioner's conduct in accepting the "rain check" dinner and the computer loan constituted improper action. In both instances, petitioner violated the general proscription against a judge's acceptance of gifts under former canon 5C(4). The "rain check" dinner cannot be viewed as ordinary social hospitality within the meaning of former canon 5C(4)(b) where, prior to the dinner, petitioner had had no personal relationship with Frega, and the dinner was occasioned by Frega's having prevailed in a court trial over which petitioner had presided. Simply allowing Frega to "pick up the tab" for a dinner, however, in and of itself, would not have placed in doubt, from the perspective of an objective observer, the independence and impartiality of petitioner, and his acceptance of this favor therefore did not rise to the level of prejudicial conduct. Similarly, because Frega had agreed to collaborate on the writing of petitioner's novel, the computer loan would not have appeared to an objective observer to be a special favor conferred as a result of petitioner's judicial office and thus did not constitute prejudicial conduct.

The Commission made no separate findings or conclusions with regard to the alleged receipt of gifts from Frega in connection with the Jeep purchase, Jeep repairs, car rental, and detailing of the 1981 Mercedes. As indicated previously, we conclude the record lacks clear and convincing evidence that petitioner was aware of Frega's contributions in connection with these transactions, although, as indicated above, petitioner's reliance upon Frega's involvement in the transactions constituted prejudicial conduct.

(B) *Gifts and favors from the law firm of Ault, Midlam & Deuprey.*

 Count 2 further alleges that in 1985, petitioner was represented in a legal proceeding by the law firm of Ault, Midlam & Deuprey. Petitioner was a personal friend of Tom Ault, a senior partner of the firm. In December 1986, petitioner accepted a legal fee write-off of $600 from the firm, which he reported on his financial disclosure statement. After 1986, members of the law firm appeared before petitioner in numerous cases.

The record reflects that on December 31, 1985, the Ault firm billed petitioner for legal services in the amount of $1,000. Between January 15, 1986, and September 8, 1986, petitioner made monthly payments of $50 toward this account. In December 1986, the Ault law firm wrote off the remaining balance of $600 and informed petitioner of this fact. Petitioner

reported the fee write-off on his financial disclosure statement, overvaluing it at $800.

Both the special masters and the Commission concluded that the fee write-off could not be characterized as an exchange of social amenities among friends and that it constituted improper action.

We conclude that petitioner's receipt of a fee write-off in a fairly substantial amount from a law firm that regularly appeared before him constituted prejudicial conduct, violating both the general proscription against a judge's acceptance of gifts from attorneys who are likely, or whose firms are likely, to appear before the judge, and the proscription against conduct permitting the inference of special influence over a judge. To an objective observer, petitioner's conduct would have compromised the independence and integrity of the judiciary.

(C) *Gifts and favors from the law firm of Duckor & Spradling.*

 Count 2 alleges that in October 1989, petitioner accepted the use of a desert resort condominium owned by Michael Duckor, a senior partner of the law firm of Duckor & Spradling, for a three-night stay. Since 1989, members of the Duckor firm have appeared before petitioner in a number of cases, and petitioner regularly has appointed Michael Duckor as a special master.

The evidence established that in approximately June 1989, petitioner began to appoint Duckor as a special master in cases involving construction defects, the attorney having acquired a reputation for exceptional skill in the resolution of these cases. Within a year, Duckor's special master activities comprised 50 percent of his practice. In 1989, approximately two-thirds of his special master activities, and in 1990 approximately 20 percent, resulted from appointment by petitioner.

Duckor testified that in the fall of 1989, he informed petitioner that he had placed his desert resort condominium on the market for sale. The condominium was made available to all prospective buyers free of charge. Petitioner testified that he spent the weekend at the condominium because he and his then fiancée were considering buying such a unit as a "weekend getaway." Ultimately petitioner decided not to purchase the condominium, and he and his fiancee subsequently purchased a resort condominium in Mexico. Duckor later sold his condominium to an unrelated party.

The condominium had a rental value of approximately $100 to $250 per day. Petitioner reported this condominium stay on his financial disclosure statement, listing its value as $220.

Count 2 further alleges that petitioner was a guest of the Duckor firm on a day fishing trip. The evidence established that on two occasions, once in 1989 and again in 1990, petitioner, together with approximately thirty other persons, was a guest on these trips sponsored by the Duckor firm and another firm, during which petitioner did not fish but read books and socialized with other judges and attorneys who were present. Each trip cost the firms approximately $130 per person.

The special masters concluded that petitioner's acceptance of the condominium stay and the fishing trips were exchanges of social hospitality and did not constitute misconduct. The Commission concluded, however, in light of the circumstance of Duckor's appointment as special master by petitioner in construction-defect cases, that petitioner's acceptance of the condominium stay and fishing trips constituted "improper action."

We adopt as our own the conclusion of the Commission that petitioner's use of Duckor's condominium constituted improper action. The California Judges Association Judicial Ethics Committee has declared the acceptance of such a gratuity to be improper: "A judge should decline the use of a boat or vacation home offered by an attorney who appears regularly in the judge's court, because such use would constitute a gift, but the judge may rent the boat or home from the attorney for the reasonable value of its use." (Cal. Judges Assn., Jud. Ethics Com., Judicial Ethics Update (Oct. 1989) p. 2, published in Rothman, Cal. Judicial Conduct Handbook.) This instance of misconduct did not rise to the level of prejudicial conduct, given the circumstance that the condominium was offered free of charge to any member of the public interested in purchasing the resort condominium.

We further conclude that petitioner's participation in the fishing trips constituted prejudicial conduct. Accepting these outings, cosponsored by a law firm whose interests regularly came before petitioner, violated former canon 5C(4)'s general proscription against the acceptance of gifts. The circumstances that these recreational activities were provided by law firms, rather than a bar association or other legal association (whose sponsorship of such an event for the benefit of judges generally would be appropriate) cast doubt upon petitioner's independence. We may assume that law firms do not as a general rule sponsor fishing trips for the benefit of the general public.

(D) *Failure to disclose or disqualify.*

Count 2 further alleges that in proceedings before petitioner, in which the Frega, Ault, and Duckor firms appeared, petitioner improperly failed to disqualify himself, make adequate disclosure on the record of his

relationship with the members of these firms, or obtain a written waiver of disqualification.

Before turning to the findings and conclusions of the special masters and the Commission regarding this allegation, we shall review the rules governing a judge's obligations of disclosure and disqualification.

Code of Civil Procedure section 170.1 provides that a judge shall be disqualified under a variety of circumstances, including (but not limited to) circumstances where (1) the judge has personal knowledge of disputed evidentiary facts concerning the proceeding, (2) the judge has served as a lawyer in the proceeding, (3) the judge has a financial interest in the subject matter of or in a party to the proceeding, (4) the judge, his or her spouse, or a close relative is a party to the proceeding, (5) a lawyer, or a spouse of a lawyer, in the proceeding is the spouse, former spouse, child, sibling, or parent of the judge or the judge's spouse, or (6) "[f]or any reason . . . a *person aware of the facts might reasonably entertain a doubt that the judge would be able to be impartial. Bias or prejudice towards a lawyer in the proceeding may be grounds for disqualification.*"[12] (Code Civ. Proc., § 170.1, subd. (a)(6), italics added.)

Code of Civil Procedure section 170.3 sets forth the procedure to be followed in the situation where a judge determines himself or herself to be disqualified. The judge must not participate further in the proceeding, except as provided in section 170.4, unless his or her disqualification is waived by the parties. (§ 170.3, subd. (a).) Subdivision (b) of section 170.3, setting forth the procedure for waiver, provides in pertinent part: "A judge who determines himself or herself to be disqualified after disclosing the basis for his or her disqualification on the record may ask the parties and their attorneys whether they wish to waive the disqualification . . . . A waiver of disqualification shall recite the basis for the disqualification, and is effective only when signed by all parties and their attorneys and filed in the record." (Code Civ. Proc., § 170.3, subd. (b)(1).)

---

[12]The 1992 version of canon 3E provides that "[a] judge should disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, or in a proceeding in which disqualification is required by law." The commentary to this canon explains that the reference to "required by law" pertains to the disqualification provisions of the Code of Civil Procedure.

The prior version of canon 3 pertaining to disqualification (which governed petitioner's obligations of disclosure and disqualification under the circumstances alleged in the formal notice) did not contain the following commentary, which appears in the 1992 version: "A judge should disclose on the record information that the judge believes the parties or their lawyers might consider relevant to the question of disqualification, even if the judge believes there is no actual basis for disqualification."

Even in the event a judge is disqualified in a particular case or proceeding, however, he or she is permitted to perform limited judicial functions, including presiding over settlement conferences (Code Civ. Proc., § 170.4, subd. (a)(6)), without any statutory obligation of disclosure.

The special masters found that between 1985 and 1991, petitioner was assigned the majority of construction-defect cases filed in the San Diego County Superior Court, having established an efficient standard operating procedure for their processing which frequently resulted in their early resolution (usually by means of settlement). These cases generally were handled by a limited number of local attorneys—approximately 150. Petitioner developed an expertise in managing these construction-defect cases and was in great demand as a settlement conference judge. The cases often were complex, involving multiple parties, and it was not uncommon for as many as 50 attorneys to attend a hearing or conference in a single case. As a result, attorneys generally noted their attendance on a sign-in sheet instead of announcing their names orally on the record, and accordingly petitioner frequently was unaware of a particular attorney's affiliation with a specific law firm. The masters expressly found that petitioner acted reasonably in not ascertaining the name and firm association of each attorney in attendance at these mass conferences. The masters also found that the evidence (including the testimony of many of the attorneys who had attended the proceedings before petitioner involving one of the three law firms) reflected there was no indication of any bias or prejudice on the part of petitioner in favor of or against any attorney.

The special masters further found that petitioner's personal relationships with Frega and Ault generally were known among the attorneys who appeared before petitioner, and that he frequently made affirmative reference to these relationships. On occasion, attorneys appearing before petitioner orally waived potential grounds for disqualification. The masters concluded that the disclosures made by petitioner were reasonable under the circumstances, and that petitioner reasonably concluded that persons aware of the facts would not entertain a doubt as to whether he would be impartial in matters that he heard involving the law firms of these attorneys.

The Commission's determination differed substantially from the special masters' assessment of the circumstances of petitioner's limited disclosure and failure to disqualify himself. The Commission concluded that petitioner's relationship with the three attorneys (Frega, Ault, and Duckor) and their law firms, including petitioner's receipt of gifts from them, was such that a person aware of these circumstances reasonably might entertain a doubt as to

petitioner's ability to be impartial in presiding over proceedings involving the firms in question. The Commission found that, although in some cases petitioner orally disclosed the nature of his relationship with these firms, such as the Ault firm's representation of petitioner, he did not disclose any of the financial benefits and gifts that he had received, such as the legal-fee write-off, and in no case did he obtain a written waiver of disqualification. In cases in which petitioner's sole involvement was presiding over settlement conferences, the Commission concluded that petitioner failed to make adequate disclosure of his relationship with the attorneys and their law firms and the gifts he had received from them. The Commission identified specific cases involving the three law firms and concluded that petitioner's failings with regard to his obligations of disclosure and disqualification in these cases constituted improper action.[13]

We agree with the conclusion of the Commission that, in light of the circumstances of petitioner's personal relationship with Frega commencing in late 1987 with their collaboration on the novel, petitioner's acceptance of the "rain check" dinner, and the loan of the laptop computer, petitioner thereafter was disqualified with respect to any matter involving Frega or his law firm. We similarly conclude that in light of petitioner's long-standing relationship with Ault, and petitioner's acceptance of a legal-fee write-off from his firm in December 1986, petitioner was disqualified with respect to any matter involving Ault or his firm as of the date of the write-off. We also conclude that following petitioner's acceptance of the 1989 condominium invitation from Duckor, whom petitioner regularly appointed as a special master, petitioner was disqualified from any matter involving the Duckor firm. We previously have concluded that petitioner's acceptance of these gifts and favors constituted improper action, if not prejudicial conduct. Under the circumstances, a person aware of these gifts and favors reasonably might entertain a doubt as to petitioner's independence and ability to remain completely impartial with respect to matters involving the three attorneys or their respective firms. (Code Civ. Proc., § 170.1, subd. (a)(6).)

As we have explained, the fact of petitioner's disqualification in a particular matter did not preclude his presiding over settlement conferences (§ 170.4, subd. (a)(6)), and the record reflects that in the majority of the cases involving the Frega and Ault firms that were identified by the Commission, petitioner's role appears to have been limited generally to conducting or coordinating settlement conferences or the consummation of settlement agreements. As explained above, the Code of Civil Procedure does not

---

[13]The record reflects that petitioner ultimately did recuse himself in certain of these cases identified by the Commission.

provide for any specific obligation of on-the-record disclosure under circumstances in which the judge performs one of the limited functions permitted of a disqualified judge.

The Commission urges that, when the ground for disqualification is a judge's receipt of gifts from one of the parties or their attorney, a judge's failure to disclose the ground for disqualification, even when conducting a limited function permitted under Code of Civil Procedure section 170.4, such as presiding over a settlement conference, is inconsistent with the requirement of canon 2A that judges at all times "promote[] public confidence in the integrity and impartiality of the judiciary." The Commission accordingly proposes that a judge's receipt of gifts from an attorney necessitates the judge's on-the-record disclosure of that circumstance in all instances in which that attorney or his or her law firm appears before the judge.

In the absence of any specific statutory requirement or canon governing a judge's obligation of disclosure under these circumstances, however, we conclude that such a prophylactic requirement of disclosure more appropriately should be promulgated by the adoption of a statutory enactment or a specific canon of ethics. Although the commentary to the 1992 version of canon 3E recommends that a judge disclose information that the parties or their attorneys *might* consider *relevant* to the issue of disqualification (even if the judge believes there are no actual grounds for disqualification or other circumstances precluding the judge from proceeding in the particular matter) (see fn. 12, *ante*), that particular permutation of the duty of disclosure was not in effect at the time of petitioner's alleged omissions in the present case, and we decline to hold petitioner to a standard beyond the general proscription against conduct creating the appearance of impropriety under canon 2.

■■■ We conclude, with respect to matters as to which petitioner's role was solely to preside over settlement conferences or settlement-related matters, that petitioner's failure to disclose on the record his relationship with the three firms did not constitute improper action under the Code of Civil Procedure or the Code of Judicial Conduct. Under different circumstances, a judge's relationship with an attorney or law firm might be such that his or her role in presiding over a settlement conference *might* create an appearance of impropriety. We defer to the findings of the special masters in this regard, however, concluding that the record lacks clear and convincing evidence of circumstances giving rise to an appearance of impropriety on petitioner's part in settlement-related proceedings.

With respect to cases in which petitioner acted in a capacity other than as settlement judge, the circumstance of his disqualification necessitated that he

disclose on the record the grounds for his disqualification and obtain a written waiver of disqualification in accordance with Code of Civil Procedure section 170.3 before proceeding. Because the record reflects that in certain cases, involving the Frega, Ault, and Duckor law firms, petitioner's role exceeded the scope of presiding over settlement-related matters or of performing other limited permissible functions, we conclude that his failure to disclose on the record in general terms the nature of his relationship with the three firms (or to obtain a written waiver of disqualification) violated the requirements of section 170.3 and therefore constituted improper action.

*Count 3*: Count 3 alleged that petitioner provided legal advice to Frega and members of Frega's law firm on cases being handled by that firm, in a manner that failed to promote public confidence in the integrity and impartiality of the judiciary, in the following alleged instances:

(i) In late 1988 or January 1989, petitioner assisted George Manning, an associate of Frega's firm, in the preparation of a settlement conference brief in an action that was pending in the San Diego County Superior Court.

(ii) In 1989, petitioner again assisted Manning in the preparation of a settlement conference brief in an action that was pending in the San Diego Superior Court.

(iii) In 1989, petitioner met with Frega to discuss a case that was pending in the San Diego County Superior Court in which Frega's firm represented the plaintiff. Petitioner provided advice with regard to a contemplated *"Tarasoff* motion" (*Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166], involving the special relationship between doctor and patient giving rise to a duty to warn foreseeable victims) prepared by the Frega firm, which subsequently was filed.

(iv) Between February 1988 and April 1988 (while the Security Pacific National Bank v. Williams litigation was pending on appeal), petitioner communicated with Frega regarding a case entitled Security Pacific National Bank v. Gustafson that was pending in the Los Angeles County Superior Court, involving the same plaintiff and cross-defendant—and similar issues relating to lender liability—as in the Security Pacific National Bank v. Williams case, which then was pending on appeal. At Frega's request, petitioner reviewed and provided his opinion regarding a special verdict rendered in that case.

The record reflects, with respect to subcounts (i) and (ii), that petitioner and Manning were close friends. Petitioner had assisted Manning in obtaining employment with the Frega firm, and petitioner was concerned about

Manning's diminishing confidence and difficulties in his relationship with Frega. Motivated by this concern, petitioner assisted Manning in the preparation of settlement conference briefs in two cases, in one case drafting an "issue analysis" that Manning incorporated almost verbatim into a brief.

With respect to subcount (iii), the record reflects the Frega firm represented the plaintiff in a medical malpractice case that had been assigned to Manning and another associate in the firm, Paula Tupper. In 1989, petitioner discussed the case with Manning, suggesting the filing of a *"Tarasoff in limine* motion." Manning related his discussion with petitioner to Tupper, who already had considered filing such a motion, independently of petitioner's suggestion. Petitioner reviewed the written motion drafted by Tupper, commenting that she had "done a good job."

With respect to subcount (iv), the record reflects petitioner communicated with Frega regarding the Gustafson case and asked Frega to send him a copy of the special verdict rendered in that case. Petitioner later volunteered to Frega his view that it appeared Frega had lost the case.

The special masters concluded the evidence failed to sustain the charges of misconduct alleged in count 3. The masters found that in assisting Manning, petitioner simply was acting out of a compassionate concern for a friend, attempting to bolster Manning's confidence in himself as a lawyer and his ability to try cases effectively. With respect to petitioner's communications with Frega, the masters concluded that, in the absence of clear and convincing evidence that petitioner had discussed any of the legal issues presented in the cases, neither wilful misconduct nor prejudicial conduct was shown.

The Commission reached a significantly different assessment of petitioner's conduct, concluding that petitioner engaged in misconduct as charged in count 3, having improperly assisted and communicated with Frega and members of his firm in pending cases, contrary to canon 2A. The Commission found that petitioner's active participation in the preparation of settlement conference briefs in cases that were to come before another member of the court upon which petitioner served, demonstrated a disregard for the integrity of the bench and constituted prejudicial conduct. The Commission further concluded that petitioner's review and approval of a *Tarasoff* motion in another case that was to come before one of petitioner's judicial colleagues amounted to egregious misconduct, demonstrating a disregard for the integrity of the bench, and constituted prejudicial conduct. The Commission finally concluded that petitioner's conduct in soliciting a

copy of the special verdict in the Security Pacific National Bank v. Gustafson case and volunteering his opinion that Frega appeared to have lost the case, at a time when the case of Security Pacific National Bank v. Williams—which involved one of the same attorneys, the same plaintiff and cross-defendant, and issues similar to those in the Gustafson case—remained pending on appeal, amounted to prejudicial conduct.

We conclude that clear and convincing evidence establishes four instances of prejudicial conduct, as charged in count 3. Motive aside, in assisting Manning in the preparation of settlement conference briefs, and discussing with Frega or members of his firm the *Tarasoff* motion, petitioner violated the canons of judicial ethics that proscribe conduct giving rise to the appearance of a party's special influence over a judge, or the judge's bias against or prejudice in favor of an attorney. From the perspective of an objective observer, and particularly from the viewpoint of opposing counsel in these cases, petitioner's conduct could be construed as relating information known or peculiarly available to members of the San Diego County Superior Court bench that was not known or made available to other attorneys. Petitioner's act of soliciting the special verdict in the Security Pacific National Bank v. Gustafson case, and providing his view as to its significance, cast doubt upon his independence and impartiality with respect to the Security Pacific National Bank v. Williams litigation, which remained pending on appeal, particularly from the perspective of opposing counsel in that case.

*Count 4*: Count 4 alleges that, in response to inquiries by the Commission regarding complaints of misconduct, petitioner made material omissions and misrepresentations and demonstrated a lack of candor, as follows:

(i) In the course of its investigation, the Commission inquired of petitioner by letter dated October 18, 1991, regarding the gift (which the judge had declared) of the $150 sweater received from Williams (discussed, *ante*), asking him to comment and supply information "regarding any appearances before [petitioner] by any of the donors [of gifts], or any attorney or entity associated with a donor, since January 1, 1985." Petitioner was directed to "[p]lease describe any appearance by a donor or associate, and indicate whether you have taken any legal action affecting a donor or associate, or whether you have recused yourself from a case involving a donor or associate." Petitioner responded by letter that the sweater "was a Christmas gift from Williams who is a personal friend and has no business before me." Petitioner failed to disclose that Williams had been a litigant who had appeared before petitioner in 1985 and 1986, and in favor of whom petitioner had awarded a judgment of approximately $5 million following a court trial.

(ii) The Commission inquired by letter dated October 18, 1991, regarding petitioner's declaration of a gift of legal services by the law firm of Ault, Midlam & Deuprey, requesting information regarding any appearances by that law firm in cases before petitioner. Petitioner responded by letter dated November 1, 1991: "Because of our friendship, Tom Ault has never appeared in front of me," failing to disclose that members of the law firm had appeared before petitioner on several occasions since January 1, 1985.

(iii) The Commission inquired by letter dated October 18, 1991, regarding declared gifts from Frega, requesting information as to any appearances by Frega or other members of Frega's law firm in cases before petitioner. Petitioner responded that "Pat Frega does not appear in front of me and I will not hear one of his cases." He also stated, "I will not hear a Frega case." In a follow-up letter, the Commission inquired whether Frega had appeared before petitioner prior to giving him the gifts. Petitioner falsely responded that "Mr. Frega last appeared before me in 1984." Petitioner failed to identify numerous cases involving Frega or his firm that had come before petitioner since 1984, including the Security Pacific National Bank v. Williams litigation.

(iv) The Commission inquired by letter dated October 18, 1991, regarding petitioner's declared stay at Duckor's desert condominium. Petitioner responded: "I recuse myself from all Duckor matters although the court uses him as a special master in cases involving construction defects." He failed to disclose that the Duckor & Spradley firm had appeared before him in three cases.

Both the special masters and the Commission determined that petitioner was acting in a judicial capacity in responding to the inquiries of the Commission. The special masters concluded that in his responses petitioner, although demonstrating a lack of candor, had not acted in bad faith, and that in each instance petitioner had committed "negligent" prejudicial conduct, but not wilful misconduct.

 The Commission, however, reached a different assessment of petitioner's dereliction, concluding that on each occasion petitioner demonstrated bad faith because in his responses he made material omissions that he knew or should have known were "beyond his authority," and for a purpose other than the faithful discharge of his judicial duties. The Commission concluded that in each instance petitioner engaged in wilful misconduct.

With respect to petitioner's response set forth in subcount (i), the Commission specifically found that petitioner's explanation that he believed the

Security Pacific National Bank v. Williams trial to have taken place in 1984 was inherently incredible. The case was a "cause celebre" that received widespread press coverage and involved the largest nonjury award that petitioner had entered up to that time. Petitioner's "Trial Judge of the Year" award from the San Diego Trial Lawyers Association in 1986 was the result of petitioner's role in that litigation. The Commission concluded that petitioner's omission in this regard was material.

With respect to petitioner's response set forth in subcount (ii), the Commission concluded that, at the time he submitted his written reply, petitioner must have known that the import of the Commission's inquiry called for him to disclose that the Ault firm had appeared before him in several cases. By his reply, petitioner demonstrated a lack of candor.

With respect to petitioner's response set forth in subcount (iii), the Commission concluded that it was unreasonable for petitioner to assume he was obligated to disclose only those instances in which Frega personally appeared before him, and not instances in which a member of Frega's firm regularly appeared before him. At the time petitioner submitted his written reply, he knew that the import of the Commission's inquiry required that he disclose all responsive material information and at the least that the Frega firm had appeared before him in several matters, including the Security Pacific National Bank v. Williams case.

Similarly, with respect to petitioner's response set forth in subcount (iv), the Commission found that at the time he submitted his written reply, petitioner must have been aware that the import of the Commission's inquiry called for him to disclose that the Duckor & Spradley firm had appeared before him in several cases.

We agree with the conclusion of the Commission that in each instance, in responding to the Commission's inquiries, petitioner was acting in a judicial capacity. The Commission's inquiry was directed to petitioner because he is a judge, and his reply was required as one of his judicial functions. We also agree that in each instance petitioner's conduct demonstrated bad faith, as defined, ante. Petitioner either knew or should have known that his responses were either inaccurate or incomplete. Although it may not be expected that petitioner would be able to identify the name of every case involving the three law firms that had come before him since 1985, petitioner reasonably should have been expected to disclose that the firms had appeared before him since January 1, 1985, and to identify at least some of their cases in some fashion. Petitioner's act of providing false and

misleading information to the Commission—the governmental entity charged with the protection of the public from judicial corruption—obviously was made for a purpose other than the faithful discharge of his duties. We therefore uphold the charges of wilful misconduct in count 4 that were sustained by the Commission.

V

Petitioner presented substantial evidence in mitigation of the charges, relating to his competence, diligence, and dedication in the performance of his judicial functions over the course of his judicial career. When appointed to the municipal court, petitioner devoted significant time and effort to the "El Cajon Experiment," a project authorizing municipal court judges to perform certain functions of a superior court in the El Cajon Municipal Court facility. When appointed to the superior court in 1979, for several years petitioner was assigned to the juvenile department, where he participated in establishing programs providing juveniles with an alternative to placement in the California Youth Authority, and activities diverting them from involvement in delinquency. In 1987, petitioner began to devote his efforts to the management of construction-defect cases, which comprised a significant portion of the matters pending in the San Diego County Superior Court. This type of litigation often was complex, involving numerous parties and attorneys, extensive discovery, and other pretrial procedures. Petitioner developed a standard operating procedure for the management of these cases, and by 1988 was considered by counsel to be the "judge of choice" for assignment of such matters.

Several judges and numerous attorneys testified to their perception of petitioner's outstanding legal and administrative skills, noting his significant contributions toward streamlining the court system and implementing a "fast-track" system.

Finally, petitioner testified before the special masters that, although at the time of the various instances of misconduct it was his perception that he had not sought out, and had not received, any special favors or benefits by reason of his judicial office, he ultimately has recognized that his conduct might have created an appearance of impropriety, damaging the prestige of his judicial office, further recognizing that therefore he had acted improperly. Petitioner's testimony further emphasized that, in hindsight, his personal relationship with Frega and his social relationship with Williams were inappropriate and inconsistent with the standards of conduct called for by his judicial office, and that he "had learned his lesson."

The foregoing evidence of petitioner's qualifications for and contribution to the judicial system, during the course of a lengthy judicial

career, does not mitigate or excuse petitioner's wilful misconduct or prejudicial conduct. (*Spruance* v. *Commission on Judicial Performance, supra*, 13 Cal.3d 778, 800.) We may, however, and do take these factors into account in considering the totality of the circumstances that are pertinent to our determination of the appropriate discipline. (See *McCartney* v. *Commission on Judicial Qualifications* (1974) 12 Cal.3d 512, 539-540 [116 Cal.Rptr. 260, 526 P.2d 268].)

## VI

The special masters found that, although petitioner had failed to appreciate the possible perception by the public of his business and social dealings, there was no evidence that petitioner's rulings or other actions executed in the exercise of his judicial duties were based upon any criteria other than the merits of the matters before him. In the course of the testimony of 57 witnesses,[14] in addition to the other evidence presented, there was no suggestion that petitioner had demonstrated any improper bias or prejudice in favor of or against any attorney or litigant. Without rendering a specific disciplinary recommendation, the masters noted their view of petitioner "as an unusually competent and innovative judge who used poor judgment in certain instances, rather than as a scoundrel who has disgraced the Bench."

In rendering its disciplinary recommendation of removal, the Commission noted specifically that it had taken into account petitioner's generally successful tenure as a judge, but emphasized that the charged misconduct began in 1987 and continued for a significant portion of petitioner's judicial career.

## VII

In making our independent determination of the appropriate disciplinary sanction, we consider the purpose of a Commission disciplinary proceeding—which is not punishment, but rather the protection of the public, the enforcement of rigorous standards of judicial conduct, and the maintenance of public confidence in the integrity and independence of the judicial system. (*Adams I, supra*, 8 Cal.4th at p. 637; *Kloepfer* v. *Commission on Judicial Performance, supra*, 49 Cal.3d at pp. 864-865.)

In past judicial disciplinary proceedings that have resulted in a judge's removal from office, the misconduct that we have determined justified this most severe of disciplinary sanctions generally has involved a pattern of arbitrary, irrational, and inappropriate conduct of the judge while acting on

---

[14]Statements of 23 additional witnesses were presented in the form of written declarations.

the bench in dealings with litigants, attorneys, witnesses, and other persons, or while otherwise performing his or her judicial functions, and an abuse of his or her judicial powers and authority. In *Kloepfer v. Commission on Judicial Performance, supra*, 49 Cal.3d 826, for example, the judge had engaged in persistent rude, abusive, hostile, and irrational behavior in dealings with litigants, attorneys, witnesses, and court personnel, often humiliating or demeaning them in the courtroom setting, and regularly abrogated the rights of criminal defendants, accepting guilty pleas from and sentencing defendants in the absence of defense counsel, and arbitrarily adjudging criminal defendants in contempt. In *McCullough v. Commission on Judicial Performance, supra*, 49 Cal.3d 186, the judge previously had been censured publicly for failing to decide a case that had been pending before him for six years, and the judge thereafter engaged in misconduct by directing a jury to find a defendant guilty in a criminal proceeding, and conducting the trial of two other defendants in the absence of their attorneys, among other derelictions on the bench. In *Spruance v. Commission on Judicial Qualifications, supra*, 13 Cal.3d 778, the judge was found to have conducted his court in a bizarre and unjudicial manner, engaging in a pervasive course of acting vindictively toward attorneys who sought to have the judge disqualified or who appealed from his decisions, and to have permitted his business relationships and social friendships improperly to influence his judicial rulings (e.g., according preferential treatment to his longtime friends and political supporters). (See also *Cannon v. Commission on Judicial Performance* (1975) 14 Cal.3d 678 [122 Cal.Rptr. 778, 537 P.2d 898] [the judge committed 21 acts of wilful misconduct and 8 other acts of prejudicial conduct, including an egregious abuse of the contempt power, often arbitrarily ordering the incarceration of public defenders and thereby depriving their clients of effective assistance of counsel].)

 To summarize our conclusions regarding the misconduct committed by petitioner:

With respect to count 1, we conclude clear and convincing evidence supports the charges that petitioner engaged in seven separate instances of prejudicial conduct in his transactions with Williams (four of which involved Frega), in petitioner's attendance at the celebratory dinner, and in his acceptance of the sweater. As we have indicated, however, the record does not support the allegations that petitioner received any special financial benefit in the Mercedes purchase transaction, or that he initiated any of these transactions with the expectation of receiving favorable treatment. We also conclude the record fails to establish by clear and convincing evidence that petitioner solicited or had any knowledge of Frega's financial contributions

in these transactions. His reliance upon Frega, however, manifests negligent if not deliberate ignorance of the likelihood that Frega would confer some financial favor or other special benefit upon him. In all instances, petitioner's conduct could be construed, from the viewpoint of an objective observer, as improperly using his judicial office to advance his personal interests, and permitting the appearance of special influence over the judge.

With respect to count 2, clear and convincing evidence supports two of the charges that petitioner engaged in prejudicial conduct in accepting gifts or financial benefits from attorneys or their law firms whose interests had come and were likely to come before petitioner, and also establishes that petitioner engaged in three separate instances of improper action. Once he was disqualified in any matter involving these attorneys or law firms, to the extent petitioner acted in a capacity other than settlement conference judge his failure to disclose on the record the grounds for disqualification and obtain a written waiver constituted improper action.

With respect to count 3, clear and convincing evidence supports the charges that petitioner engaged in four separate instances of prejudicial conduct in assisting or otherwise communicating with members of Frega's firm regarding matters pending before the San Diego County Superior Court, as well as a matter before another court involving parties, attorneys, and issues related to those involved in the Security Pacific National Bank v. Williams litigation.

Finally, with respect to count 4, clear and convincing evidence supports the charges that petitioner engaged in four separate instances of wilful misconduct in making material misstatements or omissions to the Commission. These sustained charges, in particular, warrant petitioner's removal from office. There are few judicial actions in our view that provide greater justification for removal from office than the action of a judge in deliberately providing false information to the Commission in the course of its investigation into charges of wilful misconduct on the part of the judge.

The record accordingly establishes that petitioner engaged in successive extrajudicial transactions that extended over a significant period of time, creating an appearance of serious impropriety and thereby tending to diminish the public esteem of the judiciary—a consequence petitioner either deliberately ignored or was unable to appreciate. Under these circumstances, we uphold the disciplinary recommendation of the Commission that petitioner be removed from office.

## VIII

We order that Judge G. Dennis Adams, judge of the San Diego County Superior Court, be removed from office. He shall, however, if otherwise

qualified, be permitted to resume the practice of law (art. VI, § 18, subd. (d)) on condition that he pass the Professional Responsibility Examination. Our order is effective upon finality of this decision in this court.

MOSK, J.—I dissent.

G. Dennis Adams has been a good judge for his 20 years on the bench. Of that there is no doubt. The special masters—three experienced jurists—so found. The underlying evidence was compelling.

"[Judge Adams] attended high school in San Diego and was graduated from the University of San Diego Law School in 1965. He was number two in his class academically, received the highest grade in his classes numerous times, worked on the Law Review, and was designated the outstanding graduate of 1965. In 1983 he received the alumnus of the year award from his law school. After law school he received a Ford Foundation Fellowship Scholarship Stipend in Political Science and went to work for [Senator] Mark Hatfield of Oregon as a speech writer. He then served in the military, worked for a future Attorney General of Oregon and then returned to San Diego to practice law. He practiced as a Federal Public Defender for six months and then joined his father in a law practice for approximately seven years. [Citation.]

"[Judge Adams] was appointed to the San Diego Municipal Court in 1975. While on that court he became heavily involved in the design of courts, spending many hours developing the East County Regional Center and lobbying that project through the Board of Supervisors. Beginning in 1975, [he] also participated in the so-called El Cajon Experiment, which project authorized Municipal Court Judges in El Cajon to perform certain superior court functions, both civil and criminal, in the El Cajon Municipal Court facility. This avoided the apparent necessity of establishing a branch superior court in El Cajon. [He] redrafted a bill to establish this experiment and lobbied it through the California Legislature. This project increased court efficiency in both criminal and civil matters and is still being utilized.

"[Judge Adams] was appointed to the superior court in 1979 and elected and re-elected for successive terms in 1980, 1986, and 1992. After about one year in the domestic relations department, [he] was assigned to juvenile court for several years. There, he became actively involved with legislation and programs to keep children out of the California Youth Authority. One, called 'Children In Placement[,'] involved several hundred volunteers, each assigned to monitor two or three cases for the juvenile court. This program is still operating.

"In a further attempt to help children in the juvenile justice system, [Judge Adams] initiated cooperation between the court and Vision Quest, an organization which works with children, providing them with alternative activities to delinquency involvement. The San Diego Juvenile Court is still using this means of delinquency prevention and rehabilitation.

"[Judge Adams] served in various trial departments until 1987, when he became heavily involved in cases alleging construction defects in residential housing tracts, which comprised a very important part of the case load in San Diego county in ensuing years. These cases involved numerous parties and attorneys, called for extensive discovery and other pretrial procedures, and placed a premium on skillful and diligent case management and settlement efforts. By 1988, he was generally considered the judge of choice by counsel on all sides of construction defect cases, and all such cases were assigned to him for management purposes. . . .

"During his time on the bench, [Judge Adams] has also taught in several law schools. He taught trial technique for five years at the University of San Diego Law School, later taught juvenile law at California Western University, and then constitutional law for five years at National University. He has also taught at a number of Continuing Education of the Bar and Rutter Group programs.

". . . . . . . . . . . . . . . . . . . . . . . . .

"While we are concerned about [Judge Adams's] behavior in certain respects—especially as to the charge in Count Four regarding his responses to the Commission [on Judicial Performance's] staff, and as to Count One his failure to appreciate, at the time, the possible public interpretation of his engaging in business dealings with an auto dealer [James Williams] and an attorney [Patrick Frega] in whose favor he had previously rendered a huge judgment, we have seen no evidence that his judicial work was based on anything other than the merits of the matters he was handling. We see him as an unusually competent and innovative judge who used poor judgment in certain instances, rather than as a scoundrel who has disgraced the Bench. This proceeding does not involve an evaluation of his total performance as a judge, but to the extent that the evidence from 57 witnesses has touched on that question, it suggests that he might come out well on such a test."

Just as there is no doubt that Judge Adams has been a good judge for his 20 years on the bench, there is also no doubt that he has subjected himself to discipline by certain of his acts and omissions off the bench. Indeed, he concedes the point.

But what discipline is appropriate for Judge Adams? Removal from office? I think not.

In determining appropriate discipline under former subdivision (c) of section 18 of article VI of the California Constitution, which governs the proceedings here, we seek as our "ultimate objective . . . to protect the judicial system and the public which it serves from judges who are unfit to hold office." (*McComb* v. *Commission on Judicial Performance* (1977) 19 Cal.3d Spec. Trib. Supp. 1, 9; accord, *Wenger* v. *Commission on Judicial Performance* (1981) 29 Cal.3d 615, 654 [175 Cal.Rptr. 420, 630 P.2d 954]; *Furey* v. *Commission on Judicial Performance* (1987) 43 Cal.3d 1297, 1320 [240 Cal.Rptr. 859, 743 P.2d 919]; see *Kloepfer* v. *Commission on Judicial Performance* (1989) 49 Cal.3d 826, 864-865 [264 Cal.Rptr. 100, 782 P.2d 239, 89 A.L.R.4th 235].)

The discipline that is appropriate for any given judge is the sanction that is necessary to achieve the goal of protecting the public and the judicial system itself. (See *Kloepfer* v. *Commission on Judicial Performance, supra,* 49 Cal.3d at p. 865.)

As to Judge Adams, removal is not necessary for that purpose. From all that appears, public censure would be adequate: he has shown himself to be willing and able to reform.

Let us focus on what all apparently agree to be the most serious charges, those contained in count 1 and count 4.

It cannot be denied that Judge Adams deserves discipline for his acts and omissions in count 1. The incidents involving automobile dealer James Williams and Attorney Patrick Frega were several. But, as the majority show, all of them occurred within a period of time that was relatively brief. And, as the majority effectively concede, none of them was tainted by venality.

Neither can it be denied that Judge Adams deserves discipline for his acts and omissions in count 4. His responses to inquiries by the Commission on Judicial Performance were in fact inaccurate and incomplete.

Contrary to the majority's conclusion, however, they did *not* constitute wilful misconduct.

Wilful misconduct has been defined simply as "unjudicial conduct which a judge acting in his judicial capacity commits in bad faith . . . ." (*Geiler* v.

*Commission on Judicial Qualifications* (1973) 10 Cal.3d 270, 284 [110 Cal.Rptr. 201, 515 P.2d 1].)

The majority assert that Judge Adams was "acting in his judicial capacity" when he made his responses. (*Geiler* v. *Commission on Judicial Qualifications, supra,* 10 Cal.3d at p. 284.) He was not. A physician is not providing medical services when he participates in an investigation into his conduct by the Medical Board's Division of Medical Quality. Similarly, a judge is not performing judicial functions when he participates in an investigation into his conduct by the commission.

The majority also assert that Judge Adams made his responses "in bad faith." (*Geiler* v. *Commission on Judicial Qualifications, supra,* 10 Cal.3d at p. 284.) He did not. The question, of course, goes to his state of mind. The special masters, who saw him testify and heard his testimony, found in his favor. The majority have no basis to do otherwise. They ought to give such a finding "special weight," reflecting as it does the special masters' evaluation of his credibility. (*Fitch* v. *Commission on Judicial Performance* (1995) 9 Cal.4th 552, 556 [37 Cal.Rptr.2d 581, 887 P.2d 937].) Instead, they give it no weight at all. Furthermore, they totally ignore the following undisputed fact, which the special masters evidently considered of critical import in this regard. At the time pertinent here, Judge Adams's fiancée, now his wife, was suffering from life-threatening breast cancer, for which she was subjected to various surgical procedures, and she then faced the prospect of life-threatening radiation treatment as therapy against the malignancy. Judge Adams had given himself over to caring for her, and was altogether preoccupied with her condition. Perhaps if these circumstances had not obtained, the majority's claim that he "either knew or should have known that his responses were either inaccurate or incomplete" might be sound. (Maj. opn., *ante,* at p. 910.) But since they did, their assertion is undermined by common human experience.

As to Judge Adams, as I stated above, removal is not necessary to protect the public and the judicial system itself. Certainly, such a sanction would be sharply out of line with our prior decisions. The majority recognize as much. "*In past judicial disciplinary proceedings that have resulted in a judge's removal from office,* the misconduct that we have determined justified this most severe of disciplinary sanctions generally has involved a pattern of arbitrary, irrational, and inappropriate conduct of the judge while acting on the bench in dealings with litigants, attorneys, witnesses, and other persons, or while otherwise performing his or her judicial functions, and an abuse of his or her judicial powers and authority." (Maj. opn., *ante,* at pp. 912-913,

italics added.) Judge Adams, obviously, has not engaged in a "pattern of arbitrary, irrational, and inappropriate conduct . . . while . . . performing his . . . judicial functions," nor has he "abuse[d] . . . his . . . judicial powers and authority." Quite the opposite. He has been a good judge for his 20 years on the bench.

All that the majority can say in support of removal is that, in their view, Judge Adams's "extrajudicial transactions" have "creat[ed] an appearance of serious impropriety" and have "thereby tend[ed] to diminish the public esteem of the judiciary . . . ." (Maj. opn., *ante*, at p. 914.) In so many words, they announce that he must be removed because of certain of his acts and omissions off the bench, even though he has in fact properly performed his judicial functions during his long tenure and, as the record shows, has actually increased his community's confidence in its judges. No reasonable person could agree. I surely cannot.

Because the appropriate discipline for Judge Adams is not removal but public censure, I must, and do, dissent.

Petitioner's application for a rehearing was denied September 14, 1995. Mosk , J., was of the opinion that the application should be granted.