Filed 4/3/26  In re M.C. CA4/1

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re M.C., a Person Coming Under the Juvenile Court Law. | |
| SAN DEIGO COUNTY HEALTH AND HUMAN SERVICES, | D086270 |
| Plaintiff and Respondent, | (Super. Ct. No. EJ4770) |
| v. | |
| E.C. et al., | |
| Defendants and Appellants; | |
| J.M., | |
| Intervener and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Michael P. Pulos, Judge.  Affirmed.

Jesse Jack McGowan, under appointment by the Court of Appeal, for Defendant and Appellant E.C.

Paul A. Swiller, under appointment by the Court of Appeal, for Defendant and Appellant D.M.

Mansi H. Thakkar, under appointment by the Court of Appeal, for Intervener and Appellant J.M.

Damon M. Brown, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, and Natasha Edwards, Deputy County Counsel, for Plaintiff and Respondent.

E.C. (Mother), D.M. (Father), and J.M. (Paternal Grandmother) appeal an order terminating Mother's and Father's parental rights to their son, M.C., now nearly four years old, and selecting a permanent plan of adoption for him pursuant to Welfare and Institutions Code section 366.26.[1]  Mother contends the juvenile court erred in its consideration of the evidence regarding whether the beneficial parent-child relationship exception applied to preclude the termination of her parental rights and selection of adoption as M.C.'s permanent plan.  (§ 366.26, subd. (c)(1)(B)(i).)  Father and Paternal Grandmother join in Mother's argument and do not separately raise any additional claims.  Based on our reasoning below, we affirm the order.

FACTUAL AND PROCEDURAL BACKGROUND

In spring 2022, M.C. was born to Mother and Father.  Less than one month after he was born, the San Diego County Health and Human Services Agency (Agency) filed a section 300, subdivision (b) petition alleging there was a substantial risk that M.C. would suffer serious physical harm or illness as a result of his parents' inability to supervise or protect him adequately because of an incident of domestic violence by Father against Mother and a maternal great-grandfather.  At the

_____

[1]    All statutory references are to the Welfare and Institutions Code.

2

detention hearing, the court found that the Agency had made a prima facie case on its petition, detained M.C. in out-of-home placement, and granted supervised visits for Mother and Father.

At a pretrial status conference in summer 2022, the Agency recommended that the court make a true finding on the petition's allegations, declare M.C. a dependent of the court, place him in the care of Mother in the home of maternal great-grandmother on the condition Father was not to reside in the home, grant Mother maintenance services, and grant Father enhancement services and supervised visits. The court sustained the petition, declared M.C. a dependent of the court, placed him in the care of Mother in the home of maternal great-grandmother on the condition Father was not to reside in the home and Mother was to abide by the restraining order against Father, granted maintenance services to Mother and Father, and granted supervised visitation to Father.

Four months later, the Agency filed a supplemental petition under section 387 seeking modification of the court's order, alleging Mother could not provide adequate care and supervision for M.C. because Mother had engaged in violent altercations with a boyfriend in the presence of the child, threatened to harm herself and the child, and had violated terms of the court's prior order. The Agency recommended that the court make a true finding on the petition's allegations, M.C. be continued as a dependent of the court, M.C. be removed from Mother's care and detained in out-of-home foster care, and Mother and Father be granted reunifications services and separate supervised visitation. At the detention hearing, the court found that the Agency had made a prima facie case on its petition, continued M.C. as a dependent of the court, detained M.C. in out-of-home foster care, and granted supervised visits for Mother and Father.

3

At the contested jurisdiction and disposition hearing in early 2023, the Agency recommended the court order that M.C. remain a dependent of the court, continue his placement in out-of-home foster care, and grant Mother and Father six months of reunification services and supervised visits. The court made a true finding on the petition, ordered that M.C. remain a dependent of the court, placed him in confidential foster care, ordered the Agency to provide Mother and Father with reunification services consistent with their case plans, ordered Mother and Father to comply with their case plans, and granted Mother and Father supervised visitation. The Court informed Mother and Father that, because M.C. was under three years old when removed from their custody, they had six months to participate regularly and make substantive progress in court-ordered treatment programs or to cooperate with services provided in their case plans; that failure to do so may result in termination of reunification efforts after six months; and that, after the termination of reunification efforts, parental rights could be terminated and the court could select a permanent plan for M.C. under section 366.26.

At the contested six-month review hearing in fall 2023, the court found that both Mother and Father had made adequate progress toward alleviating or mitigating the causes necessitating M.C.'s placement out of the home. The court granted Mother and Father continued reunification services and supervised visitation.

After the six-month review hearing, the court granted Mother unsupervised visitation.

At the contested 12-month review hearing in spring 2024, the Agency recommended that Father's reunifications services be terminated due to his continued demonstrated risk to M.C. and that he be granted supervised

4

visitation. The court adopted the Agency's recommendations, terminated Father's reunification services, granted Father supervised visitation, and granted Mother continued unsupervised visitation.

At the 18-month review hearing, pursuant to the Agency's recommendation, the court ordered that Mother be returned to supervised visitation due to her being under the influence of marijuana while parenting M.C. and having paraphernalia and marijuana accessible to him.

At a modification hearing in summer 2024, the Agency recommended that Mother's reunifications services be terminated due to her lack of progress and "the parent's lives . . . becoming more violent," Mother and Father be granted supervised visitation, and the court set a section 366.26 hearing to determine a permanent plan for M.C. The court terminated Mother's reunification services, granted Mother and Father supervised visitation, and set a section 366.26 hearing.

In late 2024, Mother filed a section 388 change of circumstance petition, requesting that the court place M.C. back in her care in light of her recent progress.

In its initial section 366.26 reports in early 2025, the Agency recommended that the court deny Mother's 388 petition, terminate the parental rights of Mother and Father, and order a permanent plan of adoption. The Agency recognized that Mother had consistently and regularly visited M.C. and that those visits were positive and she had made some late progress, but the Agency continued to be concerned about the relationship between Mother and Father. The Agency stated that M.C. had adjusted to his placement home, experienced sleep and emotional regulation struggles related to parental visitation, easily separated from

5

Mother at the end of visitation, and did not ask about Mother between visits. The Agency concluded there was no evidence it would be detrimental to M.C.'s emotional health to terminate Mother's parental rights and order a permanent plan of adoption. As to Father, the Agency noted visitation was sporadic and inconsistent, M.C. did not recognize Father as his father figure, and M.C. did not appear to have a strong parent-child relationship that would outweigh the benefits of adoption. The Agency stated that M.C. was specifically and generally adoptable and his current caregivers wished to adopt him. The Agency explained that, at M.C.'s young and vulnerable age, he required and deserved stability and permanency.

In an addendum report in spring 2025, the Agency changed its recommendation to a permanent plan of legal guardianship. The Agency noted that Mother continued to progress and maintained consistent positive visitation. During visitation with Mother, M.C. sought her out to meet his various needs and identified her as his mother. The Agency noted "a healthy attachment" between M.C. and Mother, although it noted M.C. does not display emotional disturbances at the end of visits and the Agency remained worried about the dynamics between Mother and Father. The Agency reported that Mother completed a bonding study, the report of which "indicate[d] that [M.C.] engages in healthy attachment behaviors toward the mother" and "a substantial, positive relationship exists between [M.C.] and [Mother]." The Agency concluded that "a parent-child bond exists between [M.C.] and [Mother], which would make the termination of parental rights detrimental to him." The Agency stated M.C. was reluctant to engage Father in physical contact and stated he was " 'ready to go' " at the end of visitation.

6

In spring 2025, following M.C.'s third birthday, the court held a two-day hearing on both Mother's 388 petition and the issue of a permanent plan under section 366.26, at which Mother represented herself. The court heard Mother's testimony and admitted into evidence the Agency's reports and Mother's exhibits, including the bonding study report. Mother sought to have M.C. placed in her care or, in the alternative, in the care of Paternal Grandmother, who was present at the hearing.

The court issued its order following the hearing. It found there had not been changed circumstances and it was not in M.C.'s best interest to return M.C. to Mother and thus denied Mother's 388 petition.[2] As to a permanent plan under section 366.26, the court found that M.C. was specifically and generally adoptable and that it was likely he would be adopted if parental rights were terminated. It found that none of the exceptions listed in section 366.26, subdivision (c)(1) applied to preclude the termination of parental rights, including the beneficial parent-child relationship exception. The court found that adoption was in M.C.'s best interest and therefore terminated Mother's and Father's parental rights and selected adoption as M.C.'s permanent plan.

After the court's order at the section 366.26 hearing, Paternal Grandmother filed a section 388 petition, requesting the court place M.C. in her care under a permanent plan of legal guardianship or adoption. The court denied the petition upon a finding it could not be granted as a matter of law.[3]

---

[2]     None of the appellants challenge this ruling on appeal.

[3]     None of the appellants challenge this ruling on appeal.

Mother, Father, and Paternal Grandmother timely filed notices of appeal, challenging the court's order for a permanent plan of adoption under section 366.26.[4]

## DISCUSSION

### I.

### *Relevant Legal Principles*

"If the court cannot safely return a dependent child to a parent's custody within statutory time limits, the court must set a hearing under section 366.26." (*In re Caden C.* (2021) 11 Cal.5th 614, 630 (*Caden C.*).) "[W]hen the court orders the section 366.26 hearing, reunification services have been terminated, and the assumption is that the problems that led to the court taking jurisdiction have not been resolved." (*Ibid.*) The purpose of a section 366.26 hearing is to determine and implement the appropriate permanent plan for a dependent child. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.) The juvenile court can choose among three permanent plans: adoption, legal guardianship, and long-term foster care. (§ 366.26, subd. (b).) When a child is adoptable, adoption is the preferred permanent plan unless there are countervailing circumstances or adoption is not in the child's best interest. (*In re Heather B.* (1992) 9 Cal.App.4th 535, 546; *In re Autumn H.* (1994) 27 Cal.App.4th 567, 574 (*Autumn H.*).)

---

[4] Respondent argues Paternal Grandmother does not have standing to challenge the juvenile court's termination of Mother's and Father's parental rights and order for a permanent plan under section 366.26. We do not address this argument because, even assuming Paternal Grandmother has standing here, as we shall explain, we reject the single claim raised by appellants.

At a section 366.26 hearing, it is the parent's burden to show an exception to termination of parental rights. (*In re Fernando M.* (2006) 138 Cal.App.4th 529, 534; *In re Erik P.* (2002) 104 Cal.App.4th 395, 401.) One exception is when the juvenile court finds "a compelling reason" for determining that termination of parental rights would be "detrimental" to the child because the "parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) The California Supreme Court has clarified that the "compelling reason" language does not impose on the parent any burden beyond the requirement to show termination of the beneficial relationship would be "detrimental" to the child. (*Caden C., supra*, 11 Cal.5th at p. 635.)

*Caden C.* stated that under section 366.26, subdivision (c)(1)(B)(i), a parent has the burden to show, by a preponderance of the evidence, three things: (1) "regular visitation and contact with the child"; (2) "the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship"; and (3) "terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C., supra*, 11 Cal.5th at p. 636.)

## II.

### *Additional Background*

At the section 366.26 hearing, Mother offered a bonding study report authored by Dr. Elizabeth Stanton, which identified Dr. Stanton only as a clinical psychologist with no other information regarding her area of practice or expertise. In her report, Dr. Stanton noted she observed Mother and M.C. for a total of three and a half hours during two separate

visits. Dr. Stanton reported that M.C. "engages in healthy attachment behaviors toward Mother" and Mother responds to M.C. supportively and appropriately. Dr. Stanton concluded "the interactions between [M.C.] and his Mother indicate that a substantial, positive relationship exists between them, and severing contact could be detrimental," and that "[e]ven if it is not immediately destabilizing, there may be challenges related to negotiating the ambiguous loss that a child may endure when a significant parent-child relationship is permanently terminated." Dr. Stanton recommended that the court "consider the substantial, positive, interpersonal interactions observed between [M.C.] and his mother when making any determinations regarding the future of their relationship."

M.C.'s counsel objected to the admission of the bonding study report absent Dr. Stanton being called as a witness. In response, Mother stated she could call Dr. Stanton to testify the following day, but that Dr. Stanton would testify consistently with the contents of her report. Given Mother's representation of Dr. Stanton's potential testimony, M.C.'s counsel withdrew her objection to the admission of the report. No party requested that the trial court designate Dr. Stanton an expert.

In considering a permanent plan under section 366.26, the court found that no exceptions to the statutory preference of adoption applied, including the beneficial parent-child relationship exception, and acknowledged the bonding study report as it related to the second and third prongs of that exception. As to the second prong of the beneficial parent-child relationship exception—whether M.C. has a beneficial attachment to Mother—the court explained it "d[id] not assign much weight to this bonding study" because the court did not "have any qualifications as to Dr. Stanton as an expert" and the report was not

10

"supported by any explanation as to who she even is." The court further noted Dr. Stanton was not available for cross-examination about her findings, and she only observed M.C. for three and a half hours and "it's hard to find that to be a substantial amount of time to assess the entirety of a relationship . . . ." As to the third prong of the exception—whether the detriment of terminating the attachment outweighs the benefit of adoption—the court explained that Dr. Stanton's report "says that there 'could be detriment' " but that the court "ha[d] to find that it's more likely than not detrimental."

## III.

### *The Juvenile Court Properly Considered Dr. Stanton's Report*

Appellants challenge the juvenile court's consideration of Dr. Stanton's bonding study report, seemingly arguing both that the court erred by finding Dr. Stanton was unqualified to offer an expert opinion and that the court erred by affording Dr. Stanton's expert report limited weight.

To the extent appellants argue that the trial court erred by finding Dr. Stanton was not qualified to offer an expert opinion, we are unpersuaded. The issue of whether a witness is qualified to testify as an expert is different from the weight the trier of fact might afford that testimony given the expert's degree of knowledge on a particular subject. (See *People v. Morales* (2020) 10 Cal.5th 76, 97 [" ' " ' "Where a witness has disclosed sufficient knowledge of the subject to entitle his opinion to go to the jury, the question of the degree of his knowledge goes more to the weight of the evidence than to its admissibility." ' " ' "]; *People v. Dowl* (2013) 57 Cal.4th 1079, 1089 (*Dowl*) ["A trial court's determination that a witness is qualified to testify 'is binding on' the jury, although jurors may

11

consider any evidence of the witness's qualifications in determining the weight to give the testimony."].) Here, the court did not find Dr. Stanton unqualified to offer an expert opinion, as appellants suggest. In fact, no party requested that the court designate Dr. Stanton an expert and appellants suggest here that the parties "effectively . . . stipulat[ed] that Dr. Stanton was qualified to render an expert opinion . . . ." Thus, the court had no occasion to make such a ruling. Rather, it admitted Dr. Stanton's report and then afforded it limited weight, in part, because the court had no evidence before it showing that Dr. Stanton had any degree of knowledge relevant to the parent-child relationship exception.[5]

To the extent appellants' argument is that the trial court abused its discretion in affording limited weight to Dr. Stanton's report, we remain unpersuaded. As appellants acknowledge, the weight to afford a bonding study report lies within the discretion of the juvenile court. (*In re M.V.* (2025) 109 Cal.App.5th 486, 508–512.) " 'An abuse of discretion will be "established by 'a showing the trial court exercised its discretion in an

_____

[5] The court also provided two other reasons for affording the report little weight, i.e., Dr. Stanton was not presented for cross-examination at the section 366.26 hearing and she spent just three and a half hours observing M.C. and Mother. Even if we could find that the juvenile court erred by deeming Dr. Stanton unqualified to render an expert opinion, any error was harmless. As we shall discuss, the three reasons the court offered for affording Dr. Stanton's report limited weight were legally valid and supported by the record, even accepting the premise that the report constituted an expert opinion. Thus, appellants cannot show they would have enjoyed a more favorable result absent any alleged error regarding Dr. Stanton's qualification as an expert witness. (*In re R.F.* (2021) 71 Cal.App.5th 459, 474 ["[A] judgment in a dependency case should not be set aside unless it is reasonably probable the result would have been more favorable to the appealing party but for the error."].)

12

arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " ' " (*Id.* at p. 509.)

As stated, the trial court afforded limited weight to Dr. Stanton's report because the report did not disclose any information regarding her degree of knowledge on the relevant issues, she was not subject to cross-examination regarding her findings, and she spent just three and a half hours observing M.C.'s relationship with Mother. These reasons are supported by the record and provided valid bases for affording less weight to Dr. Stanton's report. (*Dowl, supra*, 57 Cal.4th at p. 1089 ["[J]urors may consider any evidence of the witness's qualifications in determining the weight to give the testimony."]; see *People v. Sanchez* (2016) 63 Cal.4th 665, 675 [a trier of fact "is free to reject the expert's opinion . . . as unsound, based on faulty reasoning or analysis, or based on information the jury finds unreliable"]; cf. Evid. Code § 721 [expert witness is subject to cross-examination as to her qualifications, the subject to which her testimony relates, and the basis and reasoning for her opinion].) Thus, the court's reliance on these factors in finding Dr. Stanton's report was entitled to limited evidentiary weight was not arbitrary, capricious, or patently absurd as to amount to an abuse of discretion.[6]

---

6    We note appellants' argument that, "even assuming the juvenile court could reasonably find an insufficient basis to recognize Dr. Stanton as an expert witness, it should have ruled the bonding study inadmissible" so that Mother or the Agency could have "cure[d] the evidentiary problem." But the trial court was not permitted to guide the parties as to how to present their case. (See *Adams v. Commission on Judicial Performance* (1995) 10 Cal.4th 866, 907–908 [it is a violation of the canons of judicial ethics for a judge to help litigants prepare their cases].) This is so even though Mother was not represented by counsel at the hearing. (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1247 [a self-represented party " 'is to be

For these reasons, appellants have not shown the trial court disqualified Dr. Stanton as an expert or abused its discretion in affording her report limited evidentiary weight.

IV.

*The Court Did Not Err by Finding the Beneficial Parent-Child Relationship Exception Did Not Apply in This Case*

Lastly, to the extent appellants' argument can be interpreted as challenging the juvenile court's finding that Mother did not carry her burden to show the beneficial parent-child relationship exception applied to preclude the termination of her parental rights and selection of adoption as M.C.'s permanent plan, we are unpersuaded.

In making the determination of whether the beneficial parent-child relationship exception applies, the juvenile court "balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) Because interaction between a child and his or her parent will generally confer some incidental benefit to the child, the parent must prove the child will benefit to such a degree as to overcome the preference for adoption. (*Ibid.*) The beneficial parent-child relationship exception is not established simply by a showing of a parent's frequent and loving contact

---

treated like any other party and is entitled to the same, but no greater consideration than other litigants and attorneys' "].)

and relationship with their child. (*In re J.C.* (2014) 226 Cal.App.4th 503, 529.)

On appeal, we apply a hybrid standard in reviewing a juvenile court's determination whether the beneficial parent-child relationship exception applies. (*Caden C., supra*, 11 Cal.5th at pp. 639–641; *In re J.C., supra*, 226 Cal.App.4th at pp. 530–531.) We apply the substantial evidence standard of review to the factual issues of maintenance of regular contact and visitation and the existence of a beneficial parent-child relationship, and the abuse of discretion standard to the determination of whether there is a compelling reason for finding that termination would be detrimental to the child. (*Caden C.*, at pp. 639–641; *In re J.C.*, at pp. 530–531.) Under the substantial evidence standard of review, we consider the evidence, and make all reasonable inferences therefrom, favorably to support the court's order and disregard contrary evidence as not accepted by the court as having sufficient veracity or persuasiveness. (*Caden C.*, at p. 640; *In re S.B.* (2008) 164 Cal.App.4th 289, 297–298.) Under the abuse of discretion standard of review, we determine whether the juvenile court's decision exceeded the bounds of reason, and, in so doing, we cannot substitute our view for that of the juvenile court. (*Caden C.*, at p. 641; *In re Stephanie M.* (1994) 7 Cal.4th 295, 318–319.)

Appellants do not call into question the court's analysis as to the first prong of the three-prong *Caden C.* test for the beneficial parent-child relationship exception when it found Mother had maintained regular visitation and contact with M.C. (*Caden C., supra*, 11 Cal.5th at p. 636.) And on the second prong, whether M.C. would benefit from continuing his relationship with Mother (*ibid.*), the court conceded the parties could "disagree with each other," although the court ultimately found the second

15

prong was not met. Regardless, because, as we shall explain, the trial court did not abuse its discretion as to the third prong of the *Caden C.* test—that the benefits to M.C. of adoption outweigh the detriment to him resulting from the termination of his relationship with Mother—appellants cannot show the trial court erred in finding the parent-child relationship exception inapplicable here to bar a permanent plan of adoption for M.C.

The court weighed the benefits to M.C. of adoption (e.g., stability) against the detriment to him of terminating his relationship with Mother. In so doing, the court acknowledged that M.C. would likely feel some loss during his life because of the termination of his relationship with Mother, as every child who loses a biological parent feels loss. Furthermore, the court considered the evidence that Mother maintained a consistent positive relationship with M.C. but highlighted the lack of evidence to show severing this relationship would be sufficiently detrimental to M.C. as to outweigh the benefits of adoption. The court explained that the only evidence as to this third prong of the parent-child relationship exception was the Agency's conclusory statement that "a termination of parental rights [would be] detrimental," which was supported by nothing more than the equivocal opinion of Dr. Stanton that severing M.C.'s relationship with Mother "could" be detrimental. The court was "troubl[ed]" by "the Agency's lack of analysis of the third prong at all." The court concluded "there is nothing in the evidence to support the [third prong of the] exception, unfortunately."

Based on the record in this case, we conclude that the court did not abuse its discretion by concluding the benefits to M.C. of adoption outweighed the detriment to him from the termination of his relationship with Mother and therefore finding that Mother had not met the third

16

prong of the *Caden C.* test.  (*Caden C., supra*, 11 Cal.5th at p. 636; cf. *Autumn H., supra*, 27 Cal.App.4th at p. 575.)  The juvenile court properly applied the third prong of the *Caden C.* factors and its conclusion that no evidence supported a finding that the detriment of severing M.C.'s relationship with Mother outweighed the benefits of adoption is supported by the record.  Specifically, Dr. Stanton concluded only that "severing contact [between M.C. and Mother] *could* be detrimental," (italics added) and that "[e]ven if it is not immediately destabilizing, there *may* be challenges related to negotiating the ambiguous loss that a child may endure when a significant parent-child relationship is permanently terminated."  (Italics added.)  And, strikingly, before Dr. Stanton's report, the Agency recommended a permanent plan of adoption, concluding there was no evidence it would be detrimental to M.C.'s emotional health to terminate Mother's parental rights.  Then, seemingly based only upon the equivocal opinion of Dr. Stanton, the Agency changed its recommendation to that of legal guardianship.  Even then, however, the Agency merely made a conclusory assessment that "a parent-child bond exists between [M.C.] and [Mother], which would make the termination of parental rights detrimental to him."

Thus, we conclude that the court properly found the beneficial parent-child relationship exception did not apply to preclude the termination of Mother's and Father's parental rights and selection of adoption as M.C.'s permanent plan.  (§ 366.26, subd. (c)(1)(B)(i); *Caden C., supra*, 11 Cal.5th at p. 636.)

17

## DISPOSITION

The order is affirmed.

O'ROURKE, Acting P. J.

WE CONCUR:

KELETY, J.

RUBIN, J.